NOTICE
Decision filed 02/02/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 220764-U

NO. 5-22-0764

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Shelby County |
| | ) | |
| v. | ) | No. 12-CF-3 |
| | ) | |
| WAYNE D. NEWLIN, | ) | Honorable |
| | ) | Allan F. Lolie Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BOLLINGER* delivered the judgment of the court.
Justices Barberis and Boie concurred in the judgment.

**ORDER**

¶ 1   *Held*: We affirm the trial court's denial of defendant's postconviction petition after third-stage evidentiary hearing, where postconviction counsel did not provide unreasonable assistance in his second-stage amended postconviction petition nor his third-stage representation of the claims; further, the trial court did not manifestly err.

¶ 2   Defendant-Appellant, Wayne D. Newlin, was found guilty following a jury trial in the Circuit Court of the Fourth Judicial Circuit of Shelby County of first degree murder under the theory of accountability (720 ILCS 5/9-1(a) (West 2010)). He was thereafter sentenced to 55 years in the Illinois Department of Corrections, 15 years for a mandatory firearm enhancement and 40 years for the first degree murder. This court reviewed this case once before on appeal and affirmed

---

*Justice Vaughan was originally assigned to the panel. Due to reassignment, Justice Bollinger was later substituted on the panel and has reviewed the briefs and listened to the oral arguments.

1

defendant's sentence, finding that the trial court did not improperly weigh the relevant factors in aggravation and mitigation when sentencing defendant. *People v. Newlin*, 2014 IL App (5th) 120518. After defendant's sentence was affirmed on appeal, defendant filed a postconviction petition that ultimately advanced to, and was denied at, a third-stage evidentiary hearing. Defendant now appeals the denial of his postconviction petition, maintaining that his postconviction counsel provided him unreasonable assistance by either failing to remove non-meritorious claims when counsel amended the petition at the second stage, or failing to argue all the claims in the petition at the third stage. Defendant also argues that the trial court committed manifest error when it denied defendant's petition at the third stage because trial counsel was ineffective for failing to properly investigate and call Michael Workman as a witness, and for failing to file a motion to suppress defendant's statements to police. For the following reasons, we affirm the denial of defendant's postconviction petition at the third stage.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Jury Trial

¶ 5     On January 3, 2012, defendant was charged with three counts of first degree murder under the theory of accountability. Defendant was indicted on the three counts on January 26, 2012. The indictment alleged that defendant committed the offense in that he, "or one for whose conduct he is accountable," shot the victim, Jeremy Morgan, in the chest with a 12-gauge shotgun, thereby causing his death.

¶ 6     On July 2, 2012, prior to trial, defendant's trial attorney, Attorney Walter Lookofsky, filed a motion seeking to retain a private investigator. The motion provided, "the State has disclosed additional 'jail house snitch' evidence but has not disclosed the contents of the informant's statements." The motion also provided, "additionally the Defendant is aware of other witnesses

2

that need to be interviewed, and evidence that must be investigated in order to properly prepare his defense." On July 31, 2012, an order was filed granting the motion to retain a private investigator.

¶ 7    On September 25, 2012, the first day of trial, but before trial actually began, the trial court addressed the State's guilty plea offer. The trial court stated, "It is my understanding that the State has offered the minimum sentence as they believed the statute would allow *** the minimum sentence would be 35 years *** that would be the mandatory minimum of 20 years, plus 15 years since a firearm was utilized in the commission of the offense alleged here." The trial court stated further to defendant, "I just want to make sure that you have consulted with your attorney regarding the plea offer, and that your decision with respect to proceeding to trial is your decision, and that you are fully aware of all the consequences that could follow." The trial court asked defendant if it was still his intention to plead not guilty to the charges, to which defendant replied, "Yes, sir." The trial subsequently commenced.

¶ 8    The victim was shot multiple times and killed in his home on December 29, 2011. Prior to his death, he made a call to emergency services, asking for assistance and stating that the man he had reported burglarizing his home a few days prior had returned with a shotgun and was outside the victim's home. In the 911 call, gunfire can be heard in the background. The victim is heard pleading for his life in the recorded call and apologizing for reporting the burglary to police. The victim is also heard telling the assailant, whom he refers to as "Michael," that he planned to leave in "a couple days," he was just trying to "get his life together," and begging to be given the opportunity to leave. Toward the end of the recorded call two more shots are heard; after the first of the two, the sound of something or someone dropping can be heard, before the second "please

3

stop" can faintly be made out. The victim's body was later found in the bucket of a tractor down the road from the victim's home at an abandoned farm.

¶ 9     Jason Morgan, the victim's younger brother, testified that he picked the victim up from the victim's home and brought the two of them to their mother's home around 3 p.m. on December 25, 2011, to celebrate Christmas. Morgan identified defendant as having been his and the victim's stepfather for ten years. Morgan testified that the victim, defendant, and "Heather" were living together, and had been living together for approximately eight months. Morgan testified his belief that there was "tension" between the three roommates. Morgan also testified that defendant had bought Heather "[a]bout everything she had."

¶ 10     Morgan testified that, when he brought the victim home that Christmas night, "[t]here was a minivan backing down the driveway of my brother's trailer, and my brother told me to stop, because he wanted to ask [Michael Pease] why he was even there." Morgan testified that the victim and Pease "exchanged some words," that the victim told Pease he was not supposed to be there, and then the victim called defendant. Pease then backed out of the driveway and "sat there for a few minutes;" the victim "stood in the middle of the road watching him, and then [Pease] drove on." Morgan testified that he and the victim "continued up the driveway to find that the door [to the trailer] was kicked open, and all of my brother's stuff was gone." The victim called defendant to inform him of what happened and then called police to report the burglary and inform police of his belief that Pease committed the crime. Morgan also testified that Pease had threatened the victim on social media in the past, and he believed the threats were being made because Pease believed the victim was abusing Heather.

¶ 11     Morgan testified that he went to the victim's home again on December 29, 2011, the day of the incident, in the early afternoon to borrow defendant's chainsaw. Morgan testified that while

4

he was there that day, defendant returned with a bag of tractor parts and began working on the tractor that was outside of the victim's home while explaining to the victim what he was doing.

¶ 12 Michael Pease, the individual who pled guilty to physically killing the victim with the shotgun, also testified. Pease testified that he viewed Heather as a sister, and worked for defendant at Presnell Brothers, Incorporated, where defendant worked as an independent contractor. Pease testified that on December 22, 2011, defendant was talking about being frustrated with the victim and wanting to "get rid of" the victim. Pease testified that the next day, on December 23, 2011, defendant reiterated his desire to "get rid of" the victim and told Pease he would "owe" Pease "really badly" if Pease "could help him get rid of [the victim]." Pease testified that he told defendant that he would be able to do it. Pease testified that defendant asked him how he would be able to "get rid of" the victim, and Pease informed him that he did not have the ability to, because he was a felon and did not have a firearm or any other weapon. Pease testified that defendant informed him that "he had a 12-gauge shotgun that could not be traced to him that he would be able to give" Pease. Pease testified that defendant gave him two 45-caliber 3-inch deer slug shotgun shells, and one birdshot shotgun shell the same day. Pease testified that defendant told him the shotgun was a gift from the victim, and that defendant handed Pease the shotgun at Presnell Brothers, Incorporated. Pease testified that defendant gave him more shotgun shells in the days leading up to the victim's murder.

¶ 13 Pease testified that the same day, December 23, 2011, defendant brought him to the victim's home to show him the layout of the trailer. Pease also testified that defendant suggested that Pease commit the crime on December 25, 2011, Christmas day, because defendant and Heather would be at Heather's mother's home for Christmas. Pease testified that he "tried on the 25th to go to find [the victim] and kill him, and he was not there when I arrived. So, I called

5

[defendant] and asked him what to do, whether to leave, not to go through with the plan. [Defendant] said to walk into the house, because the front door was opened, and to steal [the victim]'s clothes, items he would think that were of value, just to piss [the victim] off." Pease testified that he was also told to release the dog in the trailer and crush the cage, because the dog "was an attachment between [the victim] and Heather." Pease testified that, as he was leaving the property Christmas day, the victim and his brother showed up and the victim kept telling Pease to get off his property.

¶ 14 Pease testified that defendant did not want to speak about the crime without the conversation happening in person. Pease also testified that he and defendant came up with a code so that Pease could text defendant to tell him if the plan worked or not; the killing was "lemon pie," and to find out if Heather and defendant were out of the victim's home, Pease asked if he should "proceed with making lemon pie."

¶ 15 Pease testified that, after the failed plan on Christmas day, defendant picked Pease up from his mother's home on December 27, 2011, and wanted to "come up with a concrete plan," something that "wouldn't leave anything to chance." Pease testified that defendant's new plan was that Pease would dispose of the victim's body in the well in the abandoned farm near the victim's home. Pease testified that when he told defendant he would not have the ability to dispose of the body, defendant told him he could use the tractor and, though the tractor was not presently working, he would fix the tractor beforehand. Pease testified that defendant told him he had plastic Pease could use to wrap the body in, and he would furnish Pease with rope and gloves to use when committing the act. Pease testified that defendant said that he could put the victim's body in the bucket of the tractor so that he could transport the body to the well, and that defendant would remove the cap from the well beforehand. Pease testified that defendant was adamant about the

6

crime happening before the new year, and that defendant's motive was that he wanted the victim out of the way "[b]ecause he thought it would give him a chance to be with Heather." Pease testified that he chose the day the crime would occur, because he would be busy the 28th and the 30th. Pease testified that defendant, with that date in mind, came up with the idea of being at Pease's mother's house with Heather at the time of the murder so he could form an alibi.

¶ 16 Pease testified that on the day of the crime he received gas money from defendant at Pease's mother's house before leaving to commit the crime. He collected the shotgun and some ammunition before arriving in the area of the victim's home. He parked his mother's van behind some buildings at the abandoned farm and walked to the victim's trailer from there. Pease shot the victim after he was at his trailer for a while. He discovered the victim had called 911 and he began to panic. He dragged the victim's body outside and struggled to get the body into the bucket of the tractor. Once he got the victim's body into the tractor bucket, he drove the tractor to the abandoned farm to finish the plan. As he was pulling into the abandoned farm, police drove past him on their way to the victim's home. He panicked and left the tractor with the victim's body still in the bucket, got in his mother's van, and left. In his haste, he dropped the spent shotgun shell casings outside, at the abandoned farm, because he was "frantic in finding the keys" to the van.

¶ 17 Pease drove to Decatur after leaving the abandoned farm to meet with some friends and get a change of clothes. He took the shotgun and threw it in Lake Decatur and put his clothes in a trash can and burned them. Pease then returned from Decatur and met defendant at their place of work, where he informed defendant that the victim was dead.

¶ 18 Pease testified that defendant previously informed him that his compensation for committing this crime was to be approximately $2,300 and a Plymouth Scant truck. Pease testified that defendant had previously informed him that the victim was beating Heather. Pease also

7

testified that his mother had been physically abused in past relationships. Pease testified that there was plastic wrap on the mower deck of the tractor with some bailing twine, that he found the key to the tractor where defendant told him he would, and that the tractor was in working order when he arrived. Pease testified that he planned to flee, but when he got back to his mother's home he fell asleep and woke up to police. Pease later brought officers to the location where he discarded the shotgun.

¶ 19    Raymond Gondek, a computer forensic scientist for the Illinois State Police, testified that he retrieved the information and data from defendant's phone, and created the extraction report. The report showed a call between defendant and Pease's phones on December 25, 2011, at 5:23 p.m. The report also showed a call between defendant and the victim's phones the same day at 6:55 p.m. The report showed that Pease's phone sent two text messages to defendant's phone on December 25, 2011; at 5:37 p.m., "Do you know where I can find a lemon?" was sent, and at 7:08 p.m., "Idk, waiting on a shopping list from you. Thats [*sic*] all I do. Then go make lemon pie. Unless you want me to go get lemons now." The report then showed on December 26, 2011, that Pease's phone sent the text message, "So whats [*sic*] up?" at 5:49 p.m. Finally, the report showed defendant's phone sent three messages to Pease's phone, stating: at 6:49 p.m., "Yeah have come up with the cash still get some stuff, biggest gift would've lemon extrac [*sic*] this year;" at 6:54 p.m., "I need find few more bucks then can get her out the house for lil [*sic*] while;" and at 6:58 p.m., "its [*sic*] an ole [*sic*] well open subject needs closure soon nough. [*sic*]"

¶ 20    Heather Thomas, the victim and defendant's roommate, testified as well. She testified that she went to Pease's mother's home around 5 p.m. or 5:30 p.m. She testified that she was dating the victim at the time, and he was not abusive. She testified that she went with defendant to her

8

mother's home on Christmas. She also testified that defendant would buy her clothes, jewelry, and food, but that they were not dating.

¶ 21 Deputy Sheriff for Shelby County Justin Dudra testified. Deputy Dudra testified that he was dispatched to the location of the incident at approximately 7:21 p.m. on December 29, 2011. As he was approaching the scene he passed "a tractor with its bucket up and lights on," and the tractor turned into the abandoned farm, that is also known in the area as the "Vouldrie residence." The abandoned farm was approximately a quarter of a mile from the victim's home. He testified that when he arrived at the scene, "the main door of the residence was open. The screen door was shut. And there was a large amount of blood on the porch down the stairs and leading into the driveway." He was with another deputy at the scene, and they both searched the immediate area. While searching the immediate area, they discovered what they believed were tractor tire marks. Having seen the tractor tire marks, the officers left the scene to visit the nearby abandoned farm. They discovered only the tractor at the abandoned farm and searched the immediate area but found no one or anything else. Both officers returned to the victim's home, and Deputy Dudra returned to the abandoned farm to inspect the area and tractor again. When he "took a closer look at the tractor," he partially saw a body in the tractor bucket, seeing only the subject's head, feet, and blood on the body. He testified that he was later asked to return to the abandoned farm by the Investigator for the Shelby County Sheriff's Office Robert McCall. After he returned, Deputy Dudra discovered three spent shotgun shells.

¶ 22 Investigator McCall testified as well. Investigator McCall testified that he received the call about this incident at approximately 8 p.m. on the day of the incident. He was part of the team that processed the scene at the victim's home, where it was believed that he was murdered. He testified that he observed "a large amount of blood on the floor of" the front porch of the trailer. He also

9

stated that he discovered "body tissue on the floor of the porch of the trailer," and what appeared to be several bullet holes in the door of the trailer. He stated, "once inside the residence, there was also a lot more blood located on the floor right inside the doorway of the trailer and down a small hallway." He stated that "[t]here was also blood and body tissue located on the floor" towards a small bedroom in the front of the trailer. Investigator McCall testified that he went to Pease's mother's home, where he found a "burn barrel" in the alleyway with a pair of cowboy boots that had blood on them and a firearm case that would commonly hold a shotgun.

¶ 23    Dr. John Scott Denton, a forensic pathologist, testified that he performed the autopsy on the victim on December 30, 2011. He testified that he observed "abundant mud on his body. There was blood on his hands and clothing" and on his shoes. Dr. Denton stated that "he had multiple shotgun wounds on his body, and also some scrapes or abrasions on his face and different parts of his extremities." He stated that the shotgun shot to his left arm was "basically [at] contact range," and the wound was from a shotgun slug that he considered a major area of injury, which went through his left arm, into his left chest, extensively lacerated his heart, went through his spine, and lodged in his right back. He stated that the aforementioned wound, "was the major wound that caused a large amount of bleeding and, essentially, stopped his heart." He also noted that the victim had seven pellets lodged in the skin of his face. Dr. Denton determined that the victim's actual cause of death, within a reasonable degree of medical and forensic certainty, was multiple shotgun wounds.

¶ 24    Carolyn Kersting, a forensic scientist specializing in firearms for the Illinois State Police, analyzed and tested the empty shotgun shell casings and the shotgun used in the commission of the crime. She testified that she received three spent 12-gauge shotgun shell casings, two Remington brand and one Winchester brand. Her opinion, within a reasonable degree of forensic

10

and scientific certainty, was that the shell casings she received were fired from the shotgun she observed.

¶ 25 Brett Shearer, an Agent for the Illinois State Police, and Matt McCormick, a Sergeant for the Illinois State Police, also testified. Agent Shearer testified that he made initial contact with defendant, and defendant went to the police station on his own free will. Agent Shearer testified that defendant signed a *Miranda*[1] warnings form and signed a form agreeing to be audio and video recorded for an interview. There was no objection to the interview recordings being admitted into evidence. Agent Shearer testified that he, Inspector Jeff Brown, and Sergeant McCormick were all in the room while defendant was being interviewed. Agent Shearer testified that the interview lasted from 12:41 a.m. on December 29, 2011, to 3:46 p.m. on December 30, 2011, and defendant was given rest breaks throughout the interview. Agent Shearer testified that defendant gave him consent to search his truck, and when he did he found a full box of 12-gauge shotgun shells in the truck. Sergeant McCormick testified that the box of shotgun shells was found on the passenger side floorboard. Sergeant McCormick spoke to Pease, who gave the following conflicting statements: that he had no problems with the victim, defendant, and Heather; and that he "felt threatened by" the victim, the victim had "threatened to beat the shit out of" him, that the victim threatened to kill defendant on occasion, and that defendant told him the victim was beating Heather.

¶ 26 Defendant was ultimately found guilty by a jury of first degree murder under the theory of accountability on September 27, 2012. On November 9, 2012, defendant was sentenced to 55 years in the Illinois Department of Corrections, with 3 years of mandatory supervised release. After

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

11

being sentenced, defendant answered "yes" to the trial court's question, "Are you satisfied with the services [your counsel, Mr. Lookofsky,] has rendered you?"

¶ 27                                    B. Post Trial

¶ 28    Following his conviction and sentencing, defendant filed a notice of appeal on November 14, 2012. Defendant appealed his sentence, stating that the trial court improperly considered an aggravating factor that was inherent in the offense. *Newlin*, 2014 IL App (5th) 120518. This court affirmed defendant's sentence.

¶ 29    On January 15, 2016, defendant filed a petition for postconviction relief that housed 22 claims. The claims were: (1) ineffective assistance of counsel for not filing a posttrial motion for a new trial; (2) ineffective assistance of counsel for not challenging the evidence of defendant's video confession, and not challenging how officers elicited his confession after he invoked his right to an attorney; (3) ineffective assistance of counsel for not challenging two prospective jurors for bias; (4) ineffective assistance of counsel for not disclosing the guilty plea offer to defendant before trial; (5) ineffective assistance of counsel for not challenging his conviction under the theory of accountability because "all evidence" points to Pease, and not defendant, being guilty; (6) ineffective assistance of counsel for not challenging crime scene evidence, asserting that it "rest[s] solely on co-defendant statement at trial which was all hearsay;" (7) ineffective assistance of counsel for not objecting "in open" to the crime scene investigator's alleged lack of board certification; (8) ineffective assistance of counsel for not challenging the statement and testimony of Pease for hearsay and alleged falsehoods; (9) ineffective assistance of counsel for not challenging the testimony of Pease for alleged falsehoods; (10) ineffective assistance of counsel for not challenging the evidence and testimony of Pease for Pease's motive to kill, alleged falsehoods, and because Pease "had a very long criminal history;" (11) the trial court abused its

12

discretion because defendant allegedly requested an attorney during questioning, and his confession was allegedly coerced and involuntary; (12) the trial court abused its discretion when it allowed circumstantial evidence and hearsay evidence to be considered; (13) the State engaged in prosecutorial misconduct in giving a highly emotional and improper closing argument that was based in Pease's alleged falsehoods; (14) ineffective assistance of counsel for not challenging DNA evidence; (15) the trial court abused its discretion in allowing the State to give the jury instructions; (16) ineffective assistance of counsel for not challenging why the statement from the jailhouse informant was not disclosed during discovery; (17) ineffective assistance of counsel for not calling Michael Pierre Workman as a witness, where he allegedly "could have testified to the truth that [defendant] had nothing to do with this case;" (18) ineffective assistance of appellate counsel for failing to raise existing "viable and meritorious issues" on appeal; (19) ineffective assistance of appellate counsel for failing to raise issues regarding juror bias, hearsay, and DNA evidence; (20) ineffective assistance of appellate counsel for failing to challenge the grand jury indictment because the jury was allegedly not properly sworn; (21) ineffective assistance of appellate counsel for failing to assert ineffective assistance of counsel; and (22) ineffective assistance of counsel and ineffective assistance of appellate counsel for failing to challenge how police obtained some of his property as evidence and did not use the evidence at trial, and did not return the property.

¶ 30    On January 22, 2016, Attorney Aaron Calvert was appointed as defendant's postconviction counsel. On November 7, 2016, Attorney Calvert stated in court, "I've reviewed everything." On June 12, 2017, Attorney Calvert filed an amended petition for a postconviction hearing. In the amended petition he states, "This Amended Motion repeats, realleges and incorporates by reference herein each and every reason and prayer for relief alleged and prayed for in said motion."

13

The amended petition also added three claims: (1) "The Defendant's counsel failed to file a motion to suppress Defendant's confession"; (2) "[t]he Defendant's counsel failed to adequately consult with client prior to trial"; and (3) "[t]here is doubt as to Defendant's guilt, and the ends of justice would be better served by a new trial in this cause."

¶ 31 In a hearing on October 4, 2017, Attorney Calvert stated that he "actually finally have located [Workman]." In the hearing Attorney Calvert alluded to his strategy being to mainly focus on certain points, but he was interrupted before he could explain which points those would be. The trial court stated that it was "being careful with this," and it wanted to "make sure the amended petition covers whatever [defendant] wanted to raise in the original petition or perhaps more." Attorney Calvert also stated that he would write defendant a letter to ask for the original copy of the *pro se* petition, after some discussion of the photocopied version being difficult to read. There was no further mention of the *pro se* petition being difficult to read, nor is the original petition included in the record.

¶ 32 On December 22, 2017, Attorney Calvert stated in a hearing, "one of our positions is that there was a witness that was never called. I found him. I spoke with him. He lives in Colorado now. He gave me some information saying that one of the complaining witnesses actually lied. I sent him an e-mail. He was supposed to—he was wanting to do an affidavit, but now he seems—he does not like needing one; will not return my calls or e-mails." The matter was continued. On April 2, 2018, Attorney Calvert explained that the delay was again attributable to him attempting to get ahold of Workman. On July 19, 2018, a subpoena for Michael P. Workman was filed.

¶ 33 On August 22, 2019, Attorney Calvert filed a certificate of compliance with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). The certificate stated: (1) "I have consulted with Defendant personally to ascertain his contentions of deprivation of constitutional rights."; (2) "I

14

have examined the trial court file."; (3) "I have examined the report of proceedings of the plea of guilty and of the sentencing hearing."; and (4) "I have made any amendments to the motion necessary for adequate presentation of any defects in the proceedings."

¶ 34    On August 24, 2019, Attorney Calvert stated in a hearing that the witness "[i]nitially *** did not comply with my Illinois subpoena at the last court setting. He recently contacted me. I spoke with him actually yesterday. That he's willing to come to Illinois if necessary. But he asked me whether or not it would be—he would be able to participate either by Skype or by phone." Then, during hearings on January 7, 2019, March 5, 2019, June 18, 2019, and January 17, 2020, Workman was either difficult to contact or simply unavailable at the last minute.

¶ 35    In the January 17, 2020, hearing, however, what Attorney Calvert planned to argue in the third-stage postconviction hearing was discussed. The trial court asked, "Counsel, are there other—I know you said you were adopting defendant's *pro se* petition. I reviewed that today. That's 78 pages long. Are you intending to proceed on all of that[?]" Attorney Calvert replied, "Judge, essentially my testimony is going to relate to the allegations alleged in my—specifically enumerated in my amended petition. The reason I adopted it is just for appeal purposes later. *** My evidence is going to be related to those particular issues." Attorney Calvert stated further, "[The witness would have been a necessary witness at trial], along with failure to consult *** by counsel—and failure to file a Motion to Suppress would be the three issues going through here." When asked by the trial court, defendant agreed "that those are the issues that are the ones the court should look at here." The trial court later asked, "Mr. Calvert, *** you assessed the other claims made by Mr. Newlin and didn't believe there was sufficient merit to proceed, is that what you're telling me?" Attorney Calvert responded, "Judge, I think that that would be an accurate

15

statement. I think with—regarding the law, the issues that I set forth are—there's a lot more law saying that they are—that there's merit to them so."

¶ 36    The hearing on January 17, 2020, continued into a partial third-stage postconviction evidentiary hearing. Defendant testified that he was taken into questioning at 9:15 p.m. on December 29, 2011, and the interview lasted until 3:30 p.m. on December 30, 2011. He testified that the questioning was "essentially continuous" and said that there were a "few little short breaks." He stated that he told the officer when the interview started that he had been awake for three consecutive days prior to questioning and was tired. Defendant testified that he "was passing out and [had] low blood sugar" during the interview. Defendant also testified that he could not see, his vision was blurry, his feet were swollen, and his "blood pressure was through the roof." He testified that he had to be taken to the hospital "for five and a half hours to determine whether I could stay in Shelbyville or had to be shipped to Springfield where they had medical services available." Defendant testified that he did not get to eat until after the booking process. Defendant testified that the officers did not read him his *Miranda* warnings, and "They just throwed [*sic*] a paper down in front of me and said, 'Here, read this.' " He also testified that he requested an attorney during the interview.

¶ 37    In the same hearing, defendant testified that he told his trial counsel, Attorney Lookofsky, that he requested counsel during the interrogation, but his attorney did not review the tape with defendant. Defendant testified that he did not watch the recorded interrogation prior to trial, and that Attorney Lookofsky only met with him three times prior to trial. Defendant testified that his longest meeting with Attorney Lookofsky was 15 minutes, and that the attorney never reviewed discovery with him. He testified that he felt he did not have adequate time to strategize with Attorney Lookofsky, and that the attorney just gave him all the discovery shortly before trial and

16

told him to read it. Defendant testified that he "assume[d]" Workman would be interviewed because he had useful information. He testified that Workman was Pease's cellmate and later became defendant's cellmate. He testified that Workman told defendant that Pease said he was using defendant as a scapegoat. Defendant testified that, by the time he told Attorney Lookofsky about Workman, Workman had already transferred to a Colorado facility. Defendant testified that his trial attorney did not ask Pease about Workman at trial, did not discuss anything about any of the witnesses with defendant prior to trial, and did not discuss any plea offers before trial. Defendant stated that he did not feel as though Attorney Lookofsky adequately represented him, stating, "I feel like I had zero representation."

¶ 38    In the next partial evidentiary hearing on November 19, 2021, Workman was again unavailable. Defendant testified further that he never complained about any of the ailments he previously testified to the police in the interview, nor did he complain about passing out. He testified that he was slurring his words in the interview with police, and that he did not realize he was confessing to anything. He testified, "I think I would have been better if I would have actually got to tell my side of things," seeming to suggest he wanted to testify at trial. He testified that he wanted to go to trial and chose to reject the 35-year plea offer on the day of trial.

¶ 39    Master Sergeant Shearer testified. He testified that he read defendant his *Miranda* rights and that defendant did not request an attorney at any point during the interview. He testified that defendant never mentioned any of the ailments he claimed to be afflicted, and that, during the interview, defendant was asked many times throughout the course of the interview if he needed to use the bathroom, or if he wanted anything to eat or drink. He testified that defendant slept multiple times during breaks, and that all the actual interviews were audio and video recorded.

17

¶ 40 Attorney Walter Lookofsky also testified. He stated that he met defendant multiple times, with three to four of the times lasting over an hour. He testified that he spent a considerable amount of time talking to defendant and, even though defendant did not want to discuss defense strategy, he continued to make attempts to discuss strategy. He testified that he did not see an issue with defendant's statement to the police, and if he had he would have filed a motion to suppress. He testified that he discussed the plea offer of 45 years with defendant, but defendant did not want to take it because he was in his" mid-50s" at the time, and it would be a *de facto* life sentence. He testified that they received a reduced offer of 35 years on the day of trial, but defendant rejected that offer as well for the same reason. He testified that he spoke to defendant about the witness, but they were never able to find and interview the man. He also testified that defendant never indicated to him that he did not know what he or the officers were saying in the interview.

¶ 41 On June 10, 2022, after almost five years after Attorney Calvert made initial contact with him, Workman was finally able to testify in the final portion of the evidentiary hearing. Workman testified that Pease was his cellmate and told him about the murder. Workman testified, "it was [Pease's] plan to get out of it by pinning it on *** Mr. Newlin. It was *** Michael's plan to get out of the charges by either pinning it on him or, you know, using him as an accomplice." Workman ultimately asked to be moved out of Pease's cell, and when he was moved, he was moved into the defendant's cell. Workman testified that he ultimately told defendant what Pease had told him, shortly before he was transferred to Colorado. Workman testified that he never reported any of what Pease told him.

¶ 42 In the same hearing, defendant admitted that the medical emergency he had that he spent "five and a half hours in the hospital" for, did not immediately follow his interview with police, but actually occurred ten days later. Defendant also admitted that he never conveyed any of what

18

Workman told him to his trial attorney and instead told Workman that he should write his attorney a letter with the information.

¶ 43 On September 20, 2022, the trial court's order denying defendant's postconviction petition at the third stage was filed. In the order, the trial court reviewed defendant's assertion that his trial attorney should have called Workman as a witness. The trial court stated that defendant's trial attorney testified that he was unsuccessful in his attempts to find Workman, and that the attorney did not believe Workman would be helpful to the case. The trial court noted the difficulty it took to locate Workman for the postconviction evidentiary hearing and stated that it could not "find that Attorney Lookofsky's alleged lack of diligence in locating Workman constituted performance falling below an objective reasonable standard." The trial court also found that, due to the overwhelming evidence against defendant, it could not find that defendant was prejudiced by Workman's absence at trial. The trial court therefore found that counsel did not provide ineffective assistance as it related to securing Workman as a witness.

¶ 44 The trial court also found that defendant did not receive ineffective assistance from trial counsel due to an alleged lack of consulting with defendant to prepare for trial. The trial court stated that defendant met neither prong of the *Strickland v. Washington*, 466 U.S. 668 (1984), analysis, because trial counsel testified that he met with defendant multiple times, some of the time for over an hour, and trial counsel seemed well prepared at trial.

¶ 45 Last, the trial court determined that trial counsel was not ineffective for not filing a motion to suppress defendant's confession to police. The trial court noted that it was rare that a suppression motion was not filed in this murder case but went on to describe the conditions of the police interview, showing that the interview was not coercive, nor were defendant's statements involuntary. The trial court went on to note that some of defendant's testimony in the evidentiary

hearing was directly rebutted by the video interview. The trial court noted that, contrary to defendant's testimony, he was mirandized, he never asked for an attorney, he never mentioned any ailments, and he did not present as though he was suffering from any ailments. The trial court also noted that defendant was never threatened, and the hospital stay defendant testified happened immediately after he was taken to the jail, really happened "almost two weeks after the Defendant gave his statement to police." The trial court found once again that defendant could not satisfy either prong of the *Strickland* analysis. A notice of appeal was filed on October 20, 2022.

¶ 46                                        II. ANALYSIS

¶ 47      Defendant argues on appeal that his postconviction counsel provided him unreasonable assistance. To support his assertion that he received unreasonable assistance, he argues three points: (1) the Rule 651(c) certificate is facially faulty and therefore does not create a rebuttable presumption; (2) the *pro se* petition is illegible, and counsel "had a duty to clean [it] up" "[a]t the very least"; and (3) counsel either failed to properly amend the petition to include only the meritorious issues, or failed to properly assert all the issues in the evidentiary hearing. Defendant also argues on appeal that the trial court committed manifest error when it denied defendant's postconviction petition after third-stage evidentiary hearing because trial counsel provided ineffective assistance by failing to (1) investigate Workman as a witness and (2) file a motion to suppress defendant's statement to police. Defendant asks that we vacate the trial court's decision and remand for a new evidentiary hearing if we find postconviction counsel provided unreasonable performance, or alternatively reverse the trial court's decision and remand this case for a new trial if we find that trial counsel was ineffective for failing to investigate Workman or failing to file a motion to suppress.

¶ 48 The State argues in response that defendant failed to rebut the presumption that postconviction counsel complied with Rule 651(c), arguing (1) the facial deficiency of the Rule 651(c) certificate is a scrivener's error, (2) defendant made no attempt to show that the 19 claims he asserts were not advanced were meritorious claims, and (3) defendant failed to establish prejudice for postconviction counsel not advancing 19 of the claims in the evidentiary hearing. The State also argues in response that the trial court did not manifestly err when denying defendant's postconviction petition after the third-stage evidentiary hearing, because (1) Workman was unreachable and (2) defendant's claim that his statement to police was involuntary is rebutted by the record.

¶ 49 In his reply, defendant asserts that there is no requirement to show prejudice when asserting that counsel failed to comply with Rule 651(c). For the following reasons, we find that defendant's postconviction counsel complied with Rule 651(c), that defendant's postconviction counsel provided reasonable assistance, and the trial court did not commit manifest error when denying defendant's postconviction petition after the third-stage evidentiary hearing.

¶ 50 A. Alleged Facial Deficiencies in Rule 651(c) Certificate and Amended Petition

¶ 51 Before addressing the issues of whether postconviction counsel properly amended the petition at the second stage, or properly advanced the petition at the third stage, we address defendant's contentions that the Rule 651(c) certificate was facially faulty and the *pro se* petition was illegible. We find neither to be the case.

¶ 52 "[A] defendant in postconviction proceedings is entitled to only a 'reasonable' level of assistance, which is less than that afforded by the federal or state constitutions." *People v. Pendleton*, 223 Ill. 2d 458, 472 (2006). Postconviction counsel must (1) consult with defendant to ascertain their claims of error, (2) examine the trial court record, and (3) make any amendments to

21

the petition that are necessary to adequately present defendant's claims to the postconviction court. Ill. S. Ct. Rule 651(c) (eff. July 1, 2017). "Appointed counsel is required to examine as much of the transcript of proceedings as is necessary to adequately present and support those constitutional claims raised by the petitioner." *People v. Davis*, 156 Ill. 2d 149, 164 (1993). Strict compliance with Rule 651(c) is not necessary for postconviction counsel, but counsel must substantially comply with the rule. *People v. Mason*, 2016 IL App (4th) 140517, ¶ 19.

¶ 53    "The filing of a certificate under Rule 651(c) by postconviction counsel signifies those duties have been fulfilled and creates a rebuttable presumption that postconviction counsel has provided the reasonable assistance contemplated by the Act." *People v. Rivera*, 2016 IL App (1st) 132573, ¶ 36. "A defendant has the burden of overcoming that presumption by demonstrating that counsel failed to substantially comply with the duties set out in Rule 651(c)." *Id.* Noncompliance with the rule will not be reviewed for harmless error, whether a Rule 651(c) certificate has been filed or not, and a showing of prejudice is not required if noncompliance is shown. *People v. Addison*, 2023 IL 127119, ¶ 33.

¶ 54    A "scrivener's error" is a clerical error resulting from a minor mistake or inadvertence. *Schaffner v. 514 West Grant Place Condominium Ass'n, Inc.*, 324 Ill. App. 3d 1033, 1041-42 (2001). "[A]n appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had sufficient factual basis. Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

¶ 55    Defendant takes issue with the portion of Attorney Calvert's Rule 651(c) certificate that reads, "I have examined the report of proceedings of the plea of guilty and of the sentencing

22

hearing." Defendant asserts that the certificate is facially faulty, because defendant made no such plea. Our review of the certificate and the record is that this sentence simply houses a scrivener's error. It is evident from the record that defendant entered into no such plea. Further, prior to filing this certificate Attorney Calvert stated in a hearing on November 7, 2016, "I've reviewed everything." This simple typographical error does not destroy the validity of the Rule 651(c) certificate.

¶ 56    Defendant also takes issue with the *pro se* postconviction petition that was incorporated into the amended petition claiming that it was illegible. More specifically, defendant alleges that the copy provided in the record has a small part of the left side of the *pro se* petition cut off by a photocopier, rendering the document illegible. There is, however, evidence in the record that this issue was cured for the trial court, and the version in the record is not the version the trial court reviewed when denying defendant's postconviction petition after the third-stage evidentiary hearing.

¶ 57    In the record provided to this court, the trial court noted many of the same problems defendant asserts concerning the legibility of the *pro se* petition in a hearing on October 4, 2017. Attorney Calvert agreed, stating that he was also having a hard time reading the photocopied version of the *pro se* petition. Toward the end of the hearing, Attorney Calvert stated that he would write a letter to defendant asking "if he has the original copy" and would ask defendant to "provide that to me so I can file that with the Court so we get a clean copy." In Attorney Calvert's petition for attorney's fees filed on January 19, 2018, he notes that he sent a "letter to client re pending matters" on October 4, 2017. Neither the letter nor the potential response to the letter is provided in the record. After the October 4, 2017, hearing and unprovided letter, neither the trial court nor Attorney Calvert complained about the illegibility of the *pro se* petition. The trial court does,

23

however, state that it reviewed defendant's *pro se* petition in a hearing on January 17, 2020, but did not remark upon any illegibility.

¶ 58   From the comments regarding the legibility of the *pro se* petition by the trial court and Attorney Calvert in the October 4, 2017, hearing, the two mentions of a letter being sent to defendant to get the original copy of the *pro se* petition, the lack of inclusion of the letter requesting the original copy of the *pro se* petition or any response to the letter in the record, and the lack of any remarks regarding the *pro se* petition's illegibility after October 4, 2017, it appears the record is insufficient in this regard. As there are doubts regarding the completeness of the record here, the illegibility of the *pro se* petition is resolved against the appellant, where he failed to present a sufficiently complete record. See *Foutch*, 99 Ill. 2d at 391-92. Further, defendant cites no authority as a basis for his assertion that, "At the very least, Calvert had a duty to clean up the *pro se* petition and reproduce it in legible form." We remind defendant, "we have the authority to hold that defendant has forfeited his argument by failing to develop it or cite any authority to support it." *Velocity Investments, LLC v. Alston*, 397 Ill. App. 3d 296, 297 (2010). Even if the record was sufficiently complete for appeal, defendant's lack of authority in support of the claim that postconviction counsel had a duty to "clean up" the *pro se* petition into a "legible form" effectively forfeits this specific argument.

¶ 59   B. Appropriate Review for Second and Third Stage Postconviction Proceedings

¶ 60   Defendant seeks this court to apply second-stage postconviction petition dismissal appellate review to a third-stage denial of a postconviction petition, stating, "651(c) compliance often does not apply to third-stage representation. *** However, even though 651(c) compliance often does not necessarily apply to counsel's representation at the third-stage, there must be some showing that Rule 651(c) was complied with at some point before the resolution of the petition."

24

Defendant utilizes *People v. Rankins*, 277 Ill. App. 3d 561 (1996), to attempt to establish why we should apply second-stage dismissal review to a third-stage denial. We disagree.

¶ 61     In *Rankins*, the defendant was convicted and later filed a *pro se* postconviction petition that was denied after a third-stage evidentiary hearing. *Rankins*, 227 Ill. App. 3d at 562. The defendant appealed, contending that his case should be remanded for further postconviction proceedings because the record did not contain a Rule 651(c) certificate, and did not show that any of his appointed postconviction counsels complied with Rule 651(c). *Id.*

¶ 62     In *Rankins*, the defendant's *pro se* petition listed two issues: (1) that the trial court imposed an unconstitutionally excessive sentence and (2) his trial counsel was ineffective for failing to file a motion to reduce sentence or a notice of appeal. *Id.* The *pro se* petition survived the first stage of a postconviction proceeding, and the defendant was appointed an attorney, Attorney Cappellini. *Id.* Shortly after Attorney Cappellini was appointed he was excused due to a potential conflict of interest; subsequently, Attorney Rumley was assigned to the defendant's case. *Id.* Attorney Rumley sought a continuance in order to amend the defendant's petition, but ultimately never made any amendments to the petition. *Id.*

¶ 63     At the second stage, the State filed a motion to dismiss the defendant's petition. *Id.* During the hearing on the motion to dismiss, Attorney Rumley never spoke, let alone argued against the State's motion. *Id.* at 562-63. The trial court dismissed the first issue in the *pro se* petition and proceeded to a third-stage evidentiary hearing on the second issue. *Id.* at 563.

¶ 64     At the third-stage evidentiary hearing, the defendant was represented by yet another attorney, Attorney Henneberry, and only the second issue in the defendant's *pro se* postconviction petition was before the court. *Id.* In the evidentiary hearing, the defendant testified that he asked his trial attorney, Attorney Kuleck, to file a motion to reduce his sentence, to file a motion for a

25

substitution of judge, and to inform the sentencing judge that his codefendant received a lesser sentence, but Attorney Kuleck failed to do so. *Id.* Attorney Kuleck testified that he asked the defendant if he wanted him to file a motion to reduce sentence and a notice of appeal, but the defendant responded that he "did not care," and he took that response to mean that he did not want them filed. *Id.* Attorney Kuleck also testified that the defendant did not request that he file a motion to substitute judge, stating that the defendant actually always wanted the trial judge he was assigned. *Id.* The trial court denied the defendant's postconviction petition after the evidentiary hearing. *Id.*

¶ 65    The appellate court noted that the defendant's argument on appeal only concerned the third-stage evidentiary hearing but still analyzed whether the defendant's attorneys at stages two and three complied with Rule 651(c). *Id.* In reviewing Attorney Rumley's performance, the court stated that he did not file a Rule 651(c) certificate, nor was there evidence that he complied with Rule 651(c) in the sense that there was no evidence he reviewed the record or consulted with the defendant. *Id.* at 564. Notably, the court stated that Attorney Rumley did not violate Rule 651(c) in the respect that he did not amend the petition. *Id.* In reviewing Attorney Henneberry's performance, the court also stated that he did not file a Rule 651(c) certificate, therefore the court then needed to review the record to determine if his conduct complied with Rule 651(c). *Id.* The court determined that the record established that Attorney Henneberry adequately reviewed the record and that the defendant did not establish that Attorney Henneberry had a duty to amend his *pro se* petition. *Id.* at 564-65. However, the court found that nothing in the record established that the defendant and Attorney Henneberry had adequately spoken about the case. *Id.* at 565. As such, the court reversed and remanded for further second and third stage proceedings. *Id.*

¶ 66 *Rankins* is quite distinguishable from the case we now decide, and we do not find *Rankins* supports second-stage dismissal appellate review to the third-stage evidentiary hearing denial in this case. Unlike in *Rankins*, a Rule 651(c) certificate was filed here. Also, and more importantly, unlike in *Rankins*, defendant kept the same postconviction counsel through the second and third stages of the postconviction proceedings. The conditions required in *Rankins* to review third-stage postconviction counsel's conduct for Rule 651(c) compliance do not exist here.

¶ 67 We note defendant's citation to *People v. Hernandez*, 298 Ill. App. 3d 36, 39 (1998), in support of his assertion that, "The only reason that this issue was never addressed is that the petition was automatically advanced to the third-stage due to the State filing neither an answer nor a motion to dismiss the amended petition. *** (post-conviction petitions advanced to third-stage when State's motion to dismiss is either denied or not filed)." The citation to this case does not provide what defendant asserts it does. Rather, *Hernandez* provides:

> "[t]he State may also, at [the second] stage, file a motion to dismiss. If the State does not file a motion to dismiss or the trial court denies such a motion, the court then *may* conduct an evidentiary hearing on the merits of the petition. *** '[D]efendant is not entitled to an evidentiary hearing on his postconviction petition as a matter of right. [Citation.] Instead, the factual allegations contained in the petition, supported where necessary by the trial record and affidavits, must first show that a substantial constitutional violation occurred before a defendant will receive such a hearing.' [Citation.] The trial court's decision to deny an evidentiary hearing *is a matter of discretion* and will not be reversed absent abuse of discretion." (Emphasis added.) *Hernandez*, 298 Ill. App. 3d at 39-40 (quoting *People v. Henderson*, 171 Ill. 2d 124, 140 (1996)).

*Hernandez* does not establish an automatic advancement to a third-stage evidentiary hearing where the State does not challenge the petition at the second stage and in fact states the opposite: that the trial court has discretion to advance the postconviction proceedings to the third stage. However, in *Boclair*, our supreme court does, in fact, provide, "If the State does not file a motion to dismiss or if the circuit court denies the State's motion, the circuit court will proceed to the third stage and conduct an evidentiary hearing on the merits of the petition." *People v. Boclair*, 202 Ill. 2d 89, 100 (2002).

¶ 68    Defendant posits a false dichotomy to this court, stating that we must choose between whether defendant's postconviction attorney "actually" incorporated defendant's *pro se* claims in hopes that appellate counsel "would pick up the slack for him on the 19 claims he thought were meritless," thereby effectively violating Rule 651(c), or whether defendant's postconviction attorney "effectively abandon[ed] the 19 claims" from the *pro se* petition "when he announced to the circuit court just before the evidentiary that they were meritless," thereby effectively violating Rule 651(c). These are not the only avenues before this court, and defendant's failure to provide compelling authority on the issue evidences why this court should not apply a second-stage standard to third-stage representation in this case. We decline defendant's request to apply the Rule 651(c) standard of compliance that counsel must adhere to at the second stage of a postconviction proceeding to the third stage here.

¶ 69    Reviewing caselaw from our sister courts, we choose to bifurcate our analysis into a review of whether the *pro se* postconviction petition was properly amended and then, separately, whether postconviction counsel provided reasonable assistance in the evidentiary hearing. In *People v. Marshall*, 375 Ill. App. 3d 670 (2007), the first district analyzed a case wherein the defendant argued the Rule 651(c) standards should apply to the third stage. *Marshall*, 375 Ill. App. 3d at 679-

28

83. The court analyzed the *Rankins* case, stating that the defendant had two different attorneys in *Rankins* at second and third stage proceedings, and that second-stage counsel failed to file a Rule 651(c) certificate of compliance. *Id.* at 682. The court recognized that in *Rankins*, the record did not show substantial compliance with Rule 651(c) as it related to second-stage counsel, which necessitated a review of third-stage counsel's compliance with the rule. *Id.* The court distinguished *Rankins*, stating, "In the case at bar, it is undisputed that second-stage counsel filed a Rule 651(c) certificate." *Id.* The court stated further that it "disagree[d] with defendant that *Rankins*' discussion of the third-stage attorney's compliance with Rule 651(c) in that case establishes that, in every postconviction case, an attorney representing a defendant at the third stage of proceedings is required to meet the rule's requirements when second-stage counsel has already complied with the rule." *Id.* The court stated later, "*Rankins* supports the conclusion that Rule 651(c)'s requirements must be met only once and not, as defendant suggests, by attorneys representing a defendant at each stage of postconviction proceedings." *Id.*

¶ 70    *People v. Pabello*, 2019 IL App (2d) 170867, and *People v. Coons*, 2024 IL App (4th) 230552, both came to a similar conclusion as *Marshall*. In *Pabello* the second district analyzed *Marshall*, *inter alia*, in discussing why Rule 651(c) does not apply to third-stage postconviction proceedings. *Pabello*, 2019 IL App (2d) 170867, ¶¶ 26-35. In analyzing *Marshall* the court stated, "once Rule 651(c) requirements have been met at the second stage, it would be illogical to require counsel at the third stage to comply further with the rule." *Id.* ¶ 27. The court stated further, "Once the petition was advanced to the third stage, Rule 651(c) no longer applied." *Id.* ¶ 28. *Coons* follows the rationale in *Marshall* and *Pabello*, stating, "Once a petition advances to a third-stage evidentiary hearing, Rule 651(c) no longer applies." *Coons*, 2024 IL App (4th) 230552, ¶ 31. Though the fourth district made such a determination, it performed an analysis on the second stage

anyway, reviewing whether the record overcame the rebuttable presumption from Rule 651(c). *Id.* ¶¶ 35-39. The court found that the record did not rebut the presumption that the attorney complied with Rule 651(c). *Id.* ¶ 38.

¶ 71 We find that we must review postconviction counsel's amendment of the *pro se* postconviction petition at the second-stage, and postconviction counsel's representation in the evidentiary hearing separately, and therefore must bifurcate this issue into two issues: (1) whether defendant established on appeal that postconviction counsel failed to properly amend defendant's *pro se* postconviction petition at the second stage and (2) whether defendant established on appeal that postconviction counsel provided unreasonable assistance at the third-stage postconviction evidentiary hearing. We find that the defendant fails to establish his burden for second-stage postconviction proceeding appellate review, and that we cannot properly review whether counsel provided reasonable assistance at the third stage without adequate argument from defendant concerning the alleged failure to amend at the second-stage postconviction proceeding.

¶ 72                    1. Second-Stage Amended Postconviction Petition

¶ 73 Regarding Rule 651(c) compliance, defendant only challenges whether postconviction counsel adequately amended his *pro se* postconviction petition. Defendant fails to satisfy his burden, set by the Illinois Supreme Court, that he show that the failure to amend resulted in the omission of any significant allegations, nor does he suggest what manner the petition should have been amended.

¶ 74 To succeed on an appeal alleging that postconviction counsel provided unreasonable assistance by failing to adequately amend the *pro se* postconviction petition in compliance with Rule 651(c), petitioner must either (1) show "that failure to amend the Pro se petition resulted in the omission of any significant allegation" or (2) suggest the "manner the petition should have

30

been amended." *People v. Dodd*, 58 Ill. 2d 53, 56 (1974) (citing *People v. Bowman*, 55 Ill. 2d 138, 140 (1973); *People v. Smith*, 40 Ill. 2d 562, 564 (1968); *People v. Gendron*, 41 Ill. 2d 518, 520 (1969); *People v. Ford*, 99 Ill. App. 3d 973, 975 (1981); *Rankins*, 277 Ill. App. 3d at 564).

¶ 75      On appeal, defendant fails to provide any argument showing that postconviction counsel so inadequately amended the petition that it resulted in the omission of a significant allegation. Further, defendant fails to provide any argument as to how the petition should have been appropriately amended. At most, defendant offers the noncommittal argument that *if* postconviction counsel believed the 19 claims he did not argue at the evidentiary hearing were not meritorious, *then* he should have removed them from the petition. This is not a suggested amendment; this is an attempt to create a catch-22 without ever asserting what the amended petition truly should have looked like. In defendant's criticism of his postconviction counsel's conduct, he failed to do the very same thing he asserts: establish clearly whether any of the 19 remaining claims lacked merit, necessitating their removal and explain how the petition should have been amended; or show that any of the 19 unamended claims should have been amended, and that postconviction counsel's failure to do so resulted in the omission of a significant allegation.

¶ 76      Contrast the need to present a clear argument on the failure to amend from the Illinois Supreme Court cases of *Dodd*, *Bowman*, *Smith*, and *Gendron*, with the showing of prejudice that *Addison*, 2023 IL 127119, speaks against. In *Addison*, the defendant was convicted and appealed his conviction. *Id*. ¶¶ 4-5. On appeal, the defendant's appellate attorney neglected to raise any issues, claiming that there were no issues of merit, and instead only filed a motion seeking sentencing credit, which was ultimately granted, crediting the defendant two days. *Id.* ¶ 6. Subsequently, the defendant filed a *pro se* postconviction petition, asserting 15 claims, 14 of which alluded to appellate counsel being ineffective. *Id.* ¶ 7. The *pro se* petition advanced to the second

31

stage, where counsel was appointed and counsel amended the petition. *Id.* ¶ 8. Counsel amended the petition down to five claims, and all the claims were directed at trial counsel or the trial court; none were directed at appellate counsel. *Id.* Postconviction counsel also filed a Rule 651(c) certificate, attesting that she had complied with Rule 651(c). *Id.* The State filed a motion to dismiss the amended petition, asserting that the claims were forfeited because they could have been raised on direct appeal. *Id.* ¶ 9. At the hearing on the motion to dismiss, postconviction counsel never countered the assertion that she failed to assert ineffective assistance of appellate counsel in the petition. *Id.* ¶ 10. In the hearing, postconviction counsel still did not assert ineffective assistance of appellate counsel. *Id.* ¶ 11. The trial court granted the State's motion to dismiss at the second stage, stating that the defendant failed to make a substantial showing of any violation of a Constitutional right. *Id.* ¶ 12. The defendant appealed, arguing that his postconviction counsel rendered unreasonable assistance for, *inter alia*, failing to argue ineffective assistance of appellate counsel. *Id.*

¶ 77    In its decision, the Illinois Supreme Court reviewed the two issues the State asserted: (1) that defendant failed to rebut the presumption of reasonable assistance provided by filing a Rule 651(c) certificate and (2) that defendant must show prejudice to be entitled to a remand for unreasonable assistance from postconviction counsel. *Id.* ¶ 17. The court found that postconviction counsel failed to provide reasonable assistance because postconviction counsel failed to shape the issues into their proper form. *Id.* ¶¶ 26-28. The court found further that a showing of prejudice is not required for remand to be necessary, following a finding that postconviction counsel did not comply with Rule 651(c). *Id.* ¶¶ 33-42.

¶ 78    We note that our decision here does not contradict *Addison*. *Addison* reiterates that prejudice need not be shown to establish noncompliance under Rule 651(c), and we do not hold

32

contrarily. *Id.* ¶¶ 33-35. What we hold is, where defendant failed to assert the failure to amend led to the omission of a significant allegation and where he failed to suggest the manner the petition should have been amended, he failed to show noncompliance with Rule 651(c) *at all*.

¶ 79                                2. Third-Stage Evidentiary Hearing

¶ 80    Defendant asserts that his postconviction counsel provided him unreasonable assistance by failing to promote 19 of his claims, claims that defendant asserts his postconviction counsel believed were meritless. Without proper argument regarding whether postconviction counsel adequately amended defendant's postconviction petition at the second stage, we cannot determine whether postconviction counsel provided reasonable assistance by asserting all the merited claims at the third-stage evidentiary hearing.

¶ 81    This court " ' "is not a repository into which an appellant may foist the burden of argument." ' " *Alston*, 397 Ill. App. 3d at 297 (quoting *Stenstrom Petroleum Services Group, Inc. v. Mesch*, 375 Ill. App. 3d 1077, 1098 (2007) quoting Obert v. Saville, 253 Ill. App. 3d 677, 682 (1993)). "[I]t is neither the function nor the obligation of this court to act as an advocate or search the record for error." *Obert*, 253 Ill. App. 3d at 682 (citing *Mielke v. Condell Memorial Hospital*, 124 Ill. App. 3d 42, 48-49 (1984))

¶ 82    Defendant's attempt to create a catch-22 for postconviction counsel ultimately resulted in a lack of proper argument as it related to whether postconviction counsel adequately amended the *pro se* petition at the second-stage postconviction proceeding. Resultingly, the false dichotomy that defendant asserted fails in both respects: (1) defendant failed to show how the petition should have been amended, or what the omission of an amendment meant to the petition and (2) defendant failed to show that the remaining claims were indeed merited, requiring presentation at the third-stage evidentiary hearing. Since defendant failed to properly argue how postconviction counsel

33

did not adequately amend the *pro se* petition, we cannot determine the issue of whether postconviction counsel provided reasonable assistance at the third-stage evidentiary hearing.

¶ 83                              C. Manifest Error

¶ 84    Defendant next asserts that the trial court committed manifest error when it denied defendant's postconviction petition after third-stage evidentiary hearing and determined that trial counsel provided effective assistance when he was unable to call Workman as a witness, and when he did not move to suppress defendant's statements to police. We find that the trial court did not manifestly err in making its decision.

¶ 85    "After an evidentiary hearing where fact-finding and credibility determinations are involved, the circuit court's decision will not be reversed unless it is manifestly erroneous." *People v. English*, 2013 IL 112890, ¶ 23. "Manifest error is error which is clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). "Thus, a decision is manifestly erroneous when the opposite conclusion is clearly evident." (Internal quotation marks omitted.) *People v. House*, 2023 IL App (4th) 220891, ¶ 78.

¶ 86    The analysis for ineffective assistance of counsel is two-prong. First, "defendant must show that trial counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Second, "[d]efendant must show that there is a reasonable probability that, but for [trial] counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "To prevail, [d]efendant must satisfy both prongs of the *Strickland* test. The failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of [trial] counsel." *People v. Yankaway*, 2025 IL 130207, ¶ 62.

¶ 87    "The benchmark for judging any claim of ineffectiveness must be whether [trial] counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be

34

relied on as having produced a just result." *Strickland*, 466 U.S. at 686. "When a convicted defendant complains of the ineffectiveness of [trial] counsel's assistance, defendant must show that [trial] counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. "[T]he performance inquiry must be whether [trial] counsel's assistance was reasonable considering the circumstances." *Id.* at 688. When reviewing defense counsel's performance, we must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of [trial] counsel's challenged conduct, and to evaluate the conduct from [trial] counsel's perspective at the time." *Id.* at 689. "[A] court must indulge a strong presumption that [trial] counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Id.* "Matters of trial strategy are generally immune from claims of ineffective assistance of [trial] counsel." (Internal quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 327 (2011). Decisions regarding whether "to file or not to file a motion" and "concerning which witnesses to call at trial and what evidence to present on defendant's behalf" are both matters of trial strategy. *People v. Bryant*, 128 Ill. 2d 448, 458 (1989); *People v. Reid*, 179 Ill. 2d 297, 310 (1997).

¶ 88    "An error by [trial] counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *** Accordingly, any deficiencies in [trial] counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland*, 466 U.S. at 691-92. "Defendant must show that there is a reasonable probability that, but for [trial] counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "In

35

making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 695.

¶ 89    Defendant first contends that trial counsel failed to adequately investigate Workman. This contention is directly rebutted at various points in the record, and it cannot be said that the trial court committed manifest error.

¶ 90    On July 2, 2012, defendant's trial attorney moved to retain a private investigator, citing a "jail house snitch." An order granting the motion was filed July 31, 2012. Defendant testified in the evidentiary hearing that he never conveyed any of what Workman told him to his trial attorney and instead told Workman to send a letter to his attorney with the information. Defendant also testified that he "assume[d]" Workman would be interviewed because he had helpful information. It also appears that defendant did not even testify that he furnished his trial attorney with Workman's name. Further, postconviction counsel first reported contact with Workman on October 4, 2017, and after many years and attempts, he was finally able to testify on June 10, 2022, almost five years later.

¶ 91    The contention that trial counsel made no attempts to find Workman is not supported by the record. Trial counsel was able to retain a private investigator for the purpose of finding this "jail house snitch." Beyond that, defendant's own testimony makes clear that he did not properly inform his attorney of the potential use of Workman as a witness. Defendant testified that he told Workman to reach out to his attorney, and that he "assume[d]" Workman would be interviewed. Further, defendant never testified that he furnished his attorney with Workman's name. It cannot be said that, when looking at these facts, the trial court committed manifest error when it determined trial counsel did not provide assistance that fell below an objective standard of reasonableness.

36

¶ 92    It also cannot be said that the trial court manifestly erred when it determined prejudice did not result because of the overwhelming evidence of guilt. The trial court listed the damning evidence in its order denying defendant's *pro se* petition after the third-stage evidentiary hearing to wit: the "lemon pie" code; Pease's testimony; and defendant's own statement. Beyond that evidence, however, is also the fact that Workman's testimony in the evidentiary hearing all centered around one central point: that Pease planned to lie to frame defendant for the crime so he could get out of jail. The motive for Pease to lie was presumably removed when he took a 45-year plea deal, because there was no longer the ability to "pin it" on defendant, yet he still testified.

¶ 93    Last, the trial court did not manifestly err when it found trial counsel was not ineffective for not filing a motion to suppress defendant's statement to police. As the trial court rightly noted in its order denying defendant's *pro se* petition after the third-stage evidentiary hearing, the interview was not continuous, defendant was allowed to sleep, defendant was offered food and drink multiple times, defendant was allowed to use the bathroom, and defendant was given his *Miranda* warnings both verbally and in written form. Also, as the trial court noted in its order, defendant made a number of false assertions in his testimony that the trial court was within its power to view as negatively impacting defendant's credibility. The trial court also noted in its order that defendant did not appear to be ill, nor did he mention wanting any medical assistance or wanting an attorney. The trial court also took exception to the fact that defendant testified that after he left the police interview, he was hospitalized for over five hours because of his poor health, when in actuality he was hospitalized almost two weeks later. As before, it cannot be said that the trial court committed manifest error when determining counsel's representation did not fall below an objective standard of reasonableness, where there were no apparent issues with the conditions under which the statement was given that would necessitate a motion to suppress.

37

¶ 94    Further, prejudice is also absent for the motion to suppress issue. "When reviewing a ruling

on a motion to suppress, overcoming the prejudice prong requires the defendant show a reasonable

probability *both* that: (1) the suppression motion would have been granted; *and* (2) the trial

outcome would have been different if the evidence had been suppressed." (Emphases in original.)

*People v. Patterson*, 2014 IL 115102, ¶ 81. "[T]he defendant must demonstrate that the unargued

suppression motion is meritorious, and that a reasonable probability exists that the trial outcome

would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL

114040, ¶ 15. Meritorious here means that "it would have succeeded." *Id.* ¶ 12. Here, the same

reasons why trial counsel's performance did not fall below an objective standard of

reasonableness, are the same reasons why the motion to suppress would have failed, even if filed.

Therefore, the trial court also did not commit manifest error when it found the defendant was not

prejudiced by his trial counsel not filing a motion to suppress his statements to police.

¶ 95                                    III. CONCLUSION

¶ 96    Therefore, we affirm the Circuit Court of Shelby County's denial of defendant's

postconviction petition after third-stage evidentiary hearing and find that postconviction counsel

did not provide unreasonable assistance, nor did the trial court commit manifest error.


¶ 97    Affirmed.