2026 IL App (1st) 232404

FOURTH DIVISION
Opinion filed: May 7, 2026

No. 1-23-2404

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 90 CR 16798 |
| | ) | |
| ERIC SMITH, | ) | Honorable |
| | ) | Patrick Coughlin, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE QUISH delivered the judgment of the court, with opinion.
Presiding Justice Navarro and Justice Lyle concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Eric Smith was charged with two counts of first degree murder for his involvement in the November 9, 1989, gang-related killings of Dan Williams and Thomas Kaufman at the Stateway Gardens housing complex in Chicago. He and five codefendants, James Young ("James Y."), Michael Meyers, Kevin Young ("Kevin Y."), Thomas Carter, and James Bannister, were jointly tried before a jury in 1991. A sixth codefendant, Michael Johnson

("Michael J."), was tried separately.[1] Defendant was convicted and sentenced to life imprisonment. After Deanda Wilson ("Deanda W."), the primary witness implicating defendant, recanted his trial testimony, defendant and Bannister received a second trial in 2004. The State presented new testimony from Michael J. implicating defendant and Bannister, who were again convicted and sentenced to life imprisonment. Defendant then filed a petition for postconviction relief under the Post-Conviction Hearing Act ("Act") (725 ILCS 5/122-1 *et seq.* (West 2010)) raising several claims, including that counsel at his second trial rendered ineffective assistance by failing to locate and call witness Andre Johnson ("Andre J.") and by failing to elicit certain testimony from witness Audrey White. Following a third-stage evidentiary hearing, the circuit court dismissed the petition. For the following reasons, we affirm the court's judgment.

¶ 2     The lengthy background leading to this appeal, which includes two trials and two postconviction evidentiary hearings, has been set forth in great detail in previous decisions from this court. Among these is an order affirming the dismissal of a postconviction petition filed by codefendant Bannister raising claims that were virtually identical to the claims defendant raises in this appeal. See *People v. Bannister*, 2025 IL App (1st) 231399-U, ¶¶ 2-53. Accordingly, we borrow much of the following recitation of the facts from our order disposing of Bannister's related appeal.

¶ 3     The shooting originated from the Stateway Gardens building at 3517-3519 South Federal Street in Chicago. Outside the building, a group of men confronted Dan Williams in the mistaken belief that he had been involved in a recent sexual assault of Audrey White, who was Kevin Y.'s

---

[1] Because this order contains numerous references to four people with the last name "Young," two people with the last name "Johnson," and two people with the last name "Wilson," we will refer to those people by their first name and last initial.

girlfriend. The men began firing at Williams and chased him toward an Illinois Institute of Technology ("IIT") research building across the street, where he fell to the ground. Both Williams and Thomas Kaufman, a security guard stationed inside the doors of the IIT building, were killed by the gunfire.

¶ 4     The only direct evidence connecting defendant to the shooting at the first trial was the testimony of Deanda W., who was 12 years old at the time and a member of the Del Vikings street gang. Deanda W. testified that, on the night of the shooting, he was with Willie Sims on the first-floor porch of the 3519 building when he saw defendant and his six codefendants, all of whom were dressed in black, approach the building. The seven men were all members of the Gangster Disciples street gang, a rival of Deanda W.'s Del Vikings gang. Deanda W. claimed that the lighting was good and that he could see the faces of all seven men.

¶ 5     According to Deanda W., defendant and Bannister arrived first and waited near a janitor's closet in the breezeway under the building, at one point passing within 10 feet of him. After he saw the other five codefendants walk through the breezeway under the building, Deanda W. then went to a second-floor porch where he saw Kevin Y., Meyers, and Carter standing below him in front of the building and James Y. and Michael J. standing on the first-floor porch of the connected 3517 building. Williams was near a play lot in front of the building when someone called out to him. Following a verbal exchange, all seven men, including defendant, stepped out from their positions and fired at Williams, who stumbled toward the IIT building and fell between its doors. Deanda W. then went downstairs, ran to the 3517 building and up to the sixth floor, where he told his grandmother and Williams' mother about the shooting. He then went back downstairs to talk to his mother, Ruth Wilson ("Ruth W."), who separately testified that he told her, "They shot Dan

and I saw everything." Deanda W. was cross-examined regarding certain alleged inconsistencies in his testimony, including whether he could actually see defendant and Bannister from his vantage point.

¶ 6     On that issue, Detective Edward Winstead testified that he had visited the second-floor porch where Deanda W. claimed to have seen the shooting, and from that location, he did not have a clear view of the janitor's closet. He testified that "if you look straight down, you probably could see the wall or maybe you would see the door or something like that. I think it's right below. I don't recall that well, your Honor, where the janitor's closet was. I think there's a storeroom directly below *** that porch. So, you couldn't really see it because it's directly below you."

¶ 7     White testified that, several hours before the shooting, she arranged to meet Kevin Y. at the apartment of Lisa Tolbert, a friend who lived in the complex. A woman named Cynthia was also there. At Kevin Y.'s request, White identified the people who had assaulted her. Kevin Y. and Carter left the apartment and returned later with Michael J., Meyers, and James Y. According to White, the five men again left the apartment at approximately 10 p.m., each dressed in black and carrying a gun. White stated that when the men returned approximately 20 minutes later, they were wearing ski masks or stocking caps over their faces. White testified that Kevin Y. took the guns the men were carrying and placed them in the radiator. James Y., Michael J., and Meyers then left, and Kevin Y., Carter, Cynthia, and White spent the night in Tolbert's apartment.

¶ 8     White further testified that, the next day, November 10, 1989, police came to Tolbert's apartment and arrested Kevin Y. and Carter. Police searched the apartment, but did not find the weapons hidden in the radiator. On November 11, 1989, White was at the third-floor apartment of Kevin Y.'s niece, Tieta Young ("Tieta Y."), with several other people, including Kevin Y.'s

brother, Mervin Young ("Mervin Y."). At one point, Mervin Y. left the apartment and then returned 30 minutes later with a bag of firearms. White recognized the firearms as the same ones she had seen the codefendants possess on the night that Williams and Kaufman were killed. Mervin told White to "beep [defendant]" and "look for [defendant's] red car." Sometime later, White saw a red car that she recognized as defendant's arrive outside the building. White told Mervin Y. that defendant's car had arrived, and Mervin Y. then went downstairs with the bag of firearms. About 30 minutes later, Mervin Y. returned, carrying only one of the firearms.

¶ 9     Defendant and his codefendants were convicted of both counts of first degree murder and sentenced to life imprisonment. On appeal, this court affirmed defendant's convictions and sentence. See *People v. Smith*, 238 Ill. App. 3d 1111 (1992) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 10    In 1993, defendant filed a petition for postconviction relief asserting a claim of actual innocence and requesting a new trial on the grounds that Deanda W. had recanted his trial testimony implicating him in the murders. In an affidavit and in a court-reported statement, Deanda W. stated that, at the time of the statement, he was 15 years old and now belonged to the same gang as defendant, the Gangster Disciples. Deanda W. further stated that, although he had seen seven people involved in the shooting, he could only positively identify four of them, and he was not certain about the identities of the remaining three, including defendant. The circuit court dismissed defendant's actual innocence claim at the second stage, and we reversed and remanded on appeal. See *People v. Smith*, 298 Ill. App. 3d 1161 (1998) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 11    At the evidentiary hearing held on remand, Deanda W. testified that, at the time of the shooting, he was with his friend Scott O'Neal inside the 3644 building. Although he could hear the gunshots directed at Williams, he could not see them, and he assumed they were coming from the 3517-19 building. He spoke to the police immediately after the shooting and told them that he had not seen anything. The next day, he learned from Denise Brady that the shooters had fled towards the 3547-49 building. Because that was the only building controlled by the Gangster Disciples, he assumed that the seven codefendants were the shooters, and he talked with three fellow gang members about "how to get [the codefendants] off the streets." Later that day, he called the police and arranged to meet with them. When he entered the interview room, laid out on the table were photos of six of the codefendants. He then told the police what he claimed to know about the shooting, which he testified was not the truth.

¶ 12    Sometime after his initial interview, Detective Winstead drove Deanda W. to testify before a grand jury. Deanda W. claimed that he told Winstead that he had not told the truth during his interview and Winstead reassured him that he was just scared and that he should just tell the grand jury what he said in the interview.

¶ 13    Deanda W. testified that, two years later, in 1991, he was incarcerated and serving a four-month sentence for aggravated assault. He received a call from an Assistant State's Attorney ("ASA") who told him that the State could make a pending drug possession charge disappear if he testified against the codefendants. On the morning of trial, Deanda W. told the ASA that he did not want to testify because he had not seen the shooting. Deanda W. testified that the ASA threatened to reinstate his drug charge if he did not testify. According to Deanda W., several days

before the shooting, he was robbed by several of the codefendants, and he stated that he testified against them because he "hated them."

¶ 14    With respect to defendant and codefendant Bannister, the court found that Deanda W.'s trial testimony was "not accurate and truthful" and there was no corroboration for Deanda W.'s implication of defendant and Bannister in the shooting. The court concluded that, as to defendant and Bannister, the outcome of the trial "would probably have been different if not for [Deanda W.'s] perjured testimony." Accordingly, the court granted defendant's postconviction petition requesting a new trial and vacated his convictions and sentence.

¶ 15    In the second trial, which was conducted before the bench in June 2004, the State presented the testimony of codefendant Michael J., who had been tried separately, convicted of both murders, and sentenced to natural life imprisonment. Michael J. acknowledged that he had agreed to testify against defendant as part of a plea agreement with the State. Under the terms of the plea agreement, he promised to testify truthfully in exchange for the State's promise to move to vacate his two murder convictions and sentence, accept his guilty plea on one count of murder, *nolle prosequi* the other murder charge, and recommend that the court impose a sentence of 60 years' imprisonment on the single murder conviction. The plea agreement also provided that Michael J. promised to testify in a manner that was consistent with his prior statements to police and prosecutors, but the agreement would be null and void if any of the representations contained in Michael J.'s prior statements, upon which the agreement was predicated, were found to be false. In addition, Michael J. testified that he asked to be transferred from the super-maximum-security facility in which he had been incarcerated and that the State promised to request a transfer to a different penitentiary.

¶ 16 Michael J. testified that, in 1989, he was a member of the Gangster Disciples and had been for approximately 10 years. On the evening of November 9, 1989, he was walking through the Stateway Gardens housing complex with James Y. and Meyers when they met defendant, Bannister, Carter, and Kevin Y. near the 3651 building. All seven men went upstairs to apartment 309, which was the home of Kevin Y.'s niece. There, they talked for about an hour, discussing a plan to shoot members of the Del Vikings gang in revenge for White's sexual assault.

¶ 17 After this discussion, the group left the apartment and went to the 3618 building. At that time, all seven men were armed with guns. Michael J. testified that he had a .25-caliber firearm and defendant had a .44-caliber firearm. When the group arrived at the second building, they encountered Andre J., whom he knew as "Rick James," who greeted Bannister by his nickname, "Nubs."[2] Kevin Y. shot at Andre J., and then all seven men ran to the 3547-49 building, where they waited for about 20 minutes before returning to Tieta Y.'s apartment. The group remained there for 45 to 60 minutes.

¶ 18 Michael J. testified that, after leaving Tieta Y.'s apartment, the group walked to the 3617 building and encountered Daniel Nicholson, who was in a wheelchair. Michael J. stood on the first-floor porch with Carter and Bannister while defendant, Kevin Y., Meyers, and James Y. followed Nicholson into the hallway. All seven men had their guns out while Kevin Y. robbed Nicholson of some gold chains and other items. After robbing Nicholson, the group walked north to the 3547-49 building. Michael J. testified that he then told the others that he was going upstairs

---

[2] During the course of this case, the following nicknames have been identified: Eric Smith (Starsky); James Bannister (Numms, Nubs, Cortez Bannister); Thomas Carter (Slick, Tom Slick); Kevin Young (Ace Dog); Michael Meyers (Ice Mike); Michael Johnson (White Mike, Little Mike); James Young (Jamo, Jaimo); Andre Johnson (Rick James); Daniel Nicholson (Wheelchair Dan); Audrey White (Peaches).

to his apartment to get a ski mask and some "wave" caps, which he described as scarves. After retrieving the ski mask and caps, he rejoined the others, gave caps to Kevin Y. and Carter, and kept a ski mask for himself.

¶ 19     Thereafter, the seven men walked together to the 3517-19 building. According to Michael J., he and Meyers walked to the 3517 side of the building near the back hallway. Defendant, Kevin Y., and Carter stood in the breezeway behind an area referred to as the "mailbox." Bannister and James Y. stood on the 3519 side of the building. As Michael J. and Meyers walked through the back hallway, they met Gregory Gordon, Willie Sims, and two women who were standing near the elevators. They also saw Denise Brady, Antoinette Barry, and Joe Johnson, who were coming out of the stairway.

¶ 20     Michael J. testified that he then heard defendant say, "come here, motherf***r." After hearing gunshots, he walked with Meyers to the front of the building to see what was happening. Michael J. stated that he saw Williams running while defendant, Bannister, Carter, Kevin Y., and James Y. were firing their guns at him. Kevin Y. stood behind the "mailbox," just inside the breezeway, with defendant and Carter. Bannister and James Y. were on the ramp from the 3519 side of the building. Defendant, Bannister, James Y., Kevin Y., and Carter stepped out from underneath the building while shooting at Williams. Michael J. testified that he shot at Williams as Williams ran to a play lot, jumped the fence, and ran toward the IIT building.

¶ 21     All seven codefendants then went to Tolbert's apartment and waited a few minutes until the police left the area. Michael J. stated that the group then left Tolbert's apartment. Defendant gave his gun to Kevin Y. and drove away, while Michael J., Meyers, James Y., Kevin Y., Carter, and Bannister went to White's apartment in another building. Michael J. did not see White in her

apartment at that time. After about ten minutes, the six remaining members of the group left the apartment, and Michael J. went to his girlfriend's house.

¶ 22 Michael J.'s testimony at defendant's second trial was substantially consistent with the statement he gave the police on December 29, 1989, the day after his arrest. Michael J. acknowledged in his testimony that, during that interview, he initially denied any involvement in the shootings and, prior to his 1991 trial, he had moved to suppress his confession, asserting that he had not been advised of his *Miranda* rights before being questioned. Michael J. testified at the second trial that the basis for his motion to suppress had been untrue because he had, in fact, been advised of his rights prior to giving the statement.

¶ 23 Daniel Nicholson testified that he had been confined to a wheelchair since 1981 and, on November 9, 1989, he was visiting his sister in Stateway Gardens. Between 9 and 10 p.m., he left his sister's apartment and went to visit White in the 3617 building. While waiting outside, he saw Kevin Y., Carter, James Y., Bannister, Meyers, Michael J., and defendant. All seven men pulled guns, and Kevin Y. and Meyers robbed him of three gold chains, a watch, and two diamond rings. Afterward, Carter told him to just roll down the ramp and not look back. Nicholson stated that, as he was leaving, he saw Williams and told him that he had just been robbed and that Williams should go to the front of the building. Despite his warning, Williams walked to the back of the building. As he was going up the ramp of his sister's building, Nicholson heard someone say, "[c]atch that motherf***r." Looking back, he saw Williams running from several people who were chasing him. He also heard several gunshots and saw flashes of gunfire.

¶ 24 Gregory Gordon testified that, in November of 1989, he lived in Stateway Gardens in the 3517-19 building. Between 9 and 10 p.m. on November 9, 1989, he was with a person known as

"Big Will." As the two men stood near the ground-floor elevators on the 3517 side of the building, they saw seven men, all of whom were dressed in dark clothing, walk into the breezeway under the building. Some of the men had bandanas or scarves over their faces. According to Gordon, Michael J. and Meyers walked past the elevators, then "one went up back and one went up the front stairway." Two other men went behind a breezeway pillar on the 3519 side of the building, but Gordon was unable to see their faces. Gordon stated that he recognized the other three men as defendant, Carter, and Kevin Y. All seven men were holding guns and Gordon specifically identified defendant's weapon as "a big caliber gun. Like a .44 Desert Eagle or something."

¶ 25     While he pressed the elevator button, Gordon heard someone say, "[c]ome here, motherf***r," and he then heard several gunshots. Gordon saw defendant, Kevin Y., and Carter in front of the breezeway when the shooting started. When the elevator doors opened, he got inside along with Big Will, two girls, and another man. In the elevator, he heard another volley of gunshots before he exited on the 10th floor. Gordon then walked to the edge of the porch and looked down, where he saw someone crawling on the ground near the IIT building. He then looked over the porch on the other side of the building and saw seven men walking in a line toward the 3547-49 building. Gordon testified that he subsequently viewed police photographs and identified defendant, Kevin Y., Carter, Meyers, and Michael J. as five of the seven men he had seen on the night of the shooting. He also identified photographs of Bannister and James Y. as people he recognized from the neighborhood, but he was unable to state with certainty that they were members of that group. Gordon testified that he specifically saw five of the seven men actively shooting at Williams, and he identified those five as defendant, Kevin Y., Carter, and the two men whose faces he did not see.

¶ 26    Gordon acknowledged that, on August 29, 1990, he gave a court-reported statement to defendant's counsel, Anita Carothers, exonerating defendant, but he explained that he was coerced into doing so and the statement was false. Gordon testified that he was escorted to Carothers' office by two men, one of whom was named Demtrius Jackson. Gordon believed that Jackson was a member of the Gangster Disciples. Jackson was armed with a revolver and in the room with Gordon when he instructed Gordon to give the statement. Gordon recalled that a man in a cowboy hat was present to record the statement. Because he feared for his life, Gordon asked the State not to call him to testify at defendant's first trial.

¶ 27    Anita Carothers testified that, when Gordon came to her office to give his statement, he was alone and Jackson was not present. There was no one present wearing a cowboy hat. According to Carothers, Gordon was placed under oath, and Gordon asked her whether he could be charged with perjury. When asked by Carothers whether he had been threatened or promised anything, Gordon responded that he had not. In his statement, Gordon admitted that, at the time of the shooting, he was under the influence of heroin, alcohol, and cigarettes.

¶ 28    The parties stipulated that, if called to testify, Cook County State's Attorney's Office investigator Courtlyn Campbell would testify that he interviewed Gordon on June 1, 2004, and that Gordon told him that Jackson had forced him into a vehicle at gunpoint and drove him to Carothers' office to sign a recanted statement that was written by a man in a cowboy hat.

¶ 29    The State also called Deanda W., who was then serving a sentence for murder in a Minnesota prison. Contrary to his first trial testimony, at the defendant's second trial, Deanda W. denied seeing the shooting of Williams and Kaufman. Deanda W. stated that he was at a completely different building and knew nothing of the murders until he heard gunshots. Deanda W. testified

that he looked out a window after the shooting was over and he did not see any of the shooters. The prosecution introduced Deanda W.'s prior inconsistent statements made during his testimony at the defendant's first trial, Michael J.'s trial, and during the proceedings before the grand jury. Deanda W. admitted that he had previously testified that defendant was present at the scene and shot at Williams, but declared that those statements were untrue.

¶ 30    Ruth W., who lived in an adjacent building, testified that she was in her bedroom when she heard shots coming from the 3517-19 building. When she looked out her window, she saw "some guys" walking away from the 3517-19 building and towards her building. Ruth W. recognized two of them as Kevin Y. and Carter and saw Kevin Y. put a gun under his coat. Ruth W. then went to look for her son, Deanda W., who was outside. When she found Deanda W., he told her that "they had shot Dan." Ruth W. testified that her son never told her that he had lied when he initially claimed to have seen defendant and his codefendants shoot Williams and Kaufman.

¶ 31    Stateway Gardens resident Denise Brady testified that around 10 p.m., she noticed two men in dark clothing and ski masks in the building's open first floor lobby or breezeway. She descended a flight of stairs to the ground level, at which point she heard a man yell "come here" and then "come here, motherf***r" in the direction of Williams, who was approaching the building from the street. Brady recalled that the man was in the breezeway wearing a long coat and baseball cap. He was not wearing a mask. Brady later identified him from a lineup as Kevin Y. Brady testified that Kevin Y. then retrieved a gun from his coat and repeatedly fired at Williams. Williams eventually stumbled onto the ground as Brady fled up the stairs. Brady recalled that when she reached the first floor, she saw the two men in ski masks also shooting at Williams, as well as two other men in the breezeway with Kevin Y. Brady saw a total of five shooters, including three men

in the breezeway and two men on the porch. She was only able to identify Kevin Y. as one of the shooters.

¶ 32    Rochelle Jackson, a Stateway Gardens resident, was a new witness at the second trial. She testified that she was in her bedroom in her second-floor apartment in the 3519 building when she heard gunshots. She ran to the window where she saw "approximately four to five guys" running towards the 3547-49 building. The men were all wearing black skullcaps.

¶ 33    Chicago Police Department forensic investigator Frank DeMarco testified that he recovered two .44-caliber cartridge cases from the ground "just east of the front entrance at 3517 South Federal." The parties also stipulated that one of the bullets removed from Williams' body was a .44-caliber.

¶ 34    When called by Bannister, White testified that in November 1989, she was living in the 3617 building at Stateway Gardens. In the early evening on November 8, 1989, White went to Tolbert's apartment in the 3547 building. When she first arrived, Kevin Y. and Carter were there, along with a woman named Cynthia. White spent the rest of the evening there and did not leave until the next day. Defendant's counsel did not ask White any questions.

¶ 35    At the conclusion of the trial, the circuit court found defendant and Bannister guilty on both counts of first degree murder, and both were again sentenced to natural life in prison. This court affirmed defendant's convictions and sentence on direct appeal. See *People v. Smith*, 377 Ill. App. 3d 1144 (2007) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 36    On October 19, 2010, defendant filed a *pro se* petition for postconviction relief, which is the subject of this appeal. The court appointed counsel for defendant, who then filed a supplemental petition. The court dismissed some of the claims upon the State's motion, including

a claim of cumulative error, and three claims were advanced to a third-stage evidentiary hearing, only two of which are at issue in this appeal.

¶ 37    First, defendant claimed that trial counsel rendered ineffective assistance by failing to elicit testimony from White contradicting Michael J.'s trial testimony implicating defendant. Defendant noted that, during his first trial, White testified that, shortly before the shooting of Williams and Kaufman, she saw five of the codefendants in Tolbert's apartment dressed in black and carrying firearms. The men left, and then the same five men returned 20 minutes later, still armed and wearing ski masks or stocking caps. White named the five men as Kevin Y., Carter, Michael J., Meyers, and James Y. Defendant contended that this testimony directly contradicted Michael J.'s testimony that the codefendants only went to Tolbert's apartment after the shooting and that all seven men were present.

¶ 38    Second, defendant asserted that trial counsel rendered ineffective assistance by failing to locate and call Andre J. as a witness. In an affidavit attached to defendant's supplemental petition, Andre J. averred that defendant and Bannister were not present when Kevin Y. shot him. He also stated that, in 2004, two men from the State's Attorney's Office came to visit him while he was at church. The men told him that "Starsky [defendant] and Hutch[3]" had been released on appeal bonds and wanted to know if he would testify against them. Andre J. told them that he could not help them because he did not see what happened after he got shot. Andre J. further averred that he was not subpoenaed to testify at either trial, and he did not talk to any investigators for the defense until April 2016. He would have been willing to testify had he been contacted. Based on these

---

[3] The record does not contain any other references to anyone named "Hutch" outside of this context, and it is not clear to whom the nickname belonged.

allegations, defendant argued that counsel should have called Andre J. to testify that he was not present when Andre J. was shot, further impeaching the credibility and testimony of Michael J., who claimed that defendant was with the group at that time.

¶ 39    On April 7, 2023, the court held an evidentiary hearing on defendant's petition, as well as a separate petition filed by Bannister raising the same two claims, among others. At the outset of the hearing, the court noted that, on the request of defendant, it conducted an in-camera inspection of the State's "blue backs" and stated, "I do not see any notations as far as an interview that was conducted on [Andre J.], nor was there any notations of a request for an investigator to be sent out to try to interview [Andre J.], also known as Rick James."

¶ 40    Noel Zupancic testified that she was an investigator for the Cook County Public Defender's Office. In 2004, she was assigned to work on Bannister's case in preparation for his retrial. In particular, she was tasked with locating and serving a subpoena on Andre J. She ran investigative searches and located several different addresses for him. She also attempted to serve a subpoena at an address in Rock Island. Although she could not remember specifically whether she was able to serve him, Zupancic believed that she was not because the service receipt portion of the subpoena was left blank. Zupancic could not remember whether she had attempted service at the other addresses. She further testified that she never communicated with defendant's trial counsel, William Laws, regarding the case or about locating Andre J., and Laws was not present at any meetings she attended with Bannister's defense team.

¶ 41    Andre J. testified that, in the early evening of November 9, 1989, he left his apartment at Stateway Gardens to go to the front of the building. At the bottom of the stairs, he encountered Michael J. He then exited the stairwell and went outside where he saw Meyers, "White Mike,"

Carter, and James Y. standing behind a mailbox. The four men pointed at him, and he then hurried down a ramp. When he reached the bottom, Kevin Y. stepped out from behind the mailbox and called to him, asking him to come over to talk about a woman who had been assaulted. When Andre J. refused, Kevin Y. shot him twice. When asked whether he saw anyone running away, Andre J. testified that he did: "the same [five] people that was standing there." Following the incident, Andre J. told police what happened and who was present. A police report regarding the incident corroborating Andre J.'s testimony was introduced into evidence and the parties stipulated that the shooting occurred at 6:10 p.m., as indicated in the report.

¶ 42    Andre J. also testified that while he was living in Rock Island in 2004, he was approached by two investigators from the Cook County State's Attorney's Office. The investigators told him that "Starsky and Hutch" had been granted appeal bonds and asked him to testify against them. Andre J. told them that he did not know anything about it and did not want to get involved. At that time, he had no knowledge of defendant's involvement in the shooting. When asked whether any defense lawyers contacted him in May or June of 2004 to ask him to testify at trial, Andre J. responded, "I'm not sure of the dates, but yeah." He then added that the person who contacted him was "[j]ust the attorney over there," but the record does not reflect to whom he was referring. When asked whether he received any subpoenas in 2004, Andre J. responded, "I got a subpoena from somewhere, but I don't remember." In response to a series of follow-up questions, he stated that he was not sure and could not remember whether he received a subpoena. In 2016, Andre J. was approached by Bannister's attorney and an investigator. He told them what he saw on the night of the shooting and agreed to give a statement. He then signed an affidavit, which was admitted into evidence.

¶ 43    On cross-examination, Andre J. denied having previously told an ASA and two investigators that he knew "Starsky and Hutch" for many years prior to the shooting. He was also confronted with his 2016 affidavit, in which he averred that he told the two investigators who approached him in 2004 that he could not testify against "Starsky and Hutch" because he did not see them when he was shot. Andre J. also stated in the affidavit, which he acknowledged reading and signing, that "Starsky and Hutch lived in [the] neighborhood, and they were ranked under Ace Dog [Kevin Y.]." When counsel pointed to defendant and Bannister and asked Andre J. if he knew them, he stated that he did not. He denied telling police that defendant was in a group of people that attacked him. He did not witness the shooting of Williams and Kaufman.

¶ 44    William Laws testified that he represented defendant at defendant's second trial in 2004. He recalled that the police reports concerning the shooting of Andre J. mentioned five suspects, a group that did not include defendant. Laws agreed that challenging Michael J.'s credibility was a very important issue and that Andre J. was the only witness who could have refuted Michael J.'s testimony regarding who was present when Andre J. was shot. Laws confirmed that he was referring to Andre J. when he told the court at the second trial that "we haven't been able to locate him." He did not have an address for Andre J., and if he did, he was unsuccessful in locating him. Laws agreed that it was a mistake to fail to compel Andre J.'s attendance at trial. Regarding his decision not to question White, Laws testified that he did not know why he did not ask her any questions at the second trial about which of the codefendants she had seen before and after the shooting, and it was not a strategic decision.

¶ 45    Michael J. also testified at the hearing and recanted his trial testimony implicating Bannister in the murders of Williams and Kaufman, but maintained that defendant was present and

took part in the murders. He testified that his statement in his affidavit that defendant was not involved in the murders was not true.

¶ 46 Following the hearing, the circuit court dismissed the remainder of defendant's petition. Initially, in the course of addressing defendant's due process claim relating to the State's potential concealment of its knowledge of Andre J.'s whereabouts, which is not at issue in this appeal, the court found Andre J., "having had an opportunity to observe and hear his testimony at the evidentiary hearing, to be an unreliable historian." The court observed that Andre J. was unsure of or could not recall numerous issues, including addresses, phone numbers, dates, or descriptions of people with whom he met. The court also found that Andre J.'s testimony "runs counter to the factual record," with the court observing that the nickname "Hutch" had never come up in any police report or proceeding transcript and it was therefore "incredible" that investigators would have asked him about knowing "Hutch." The court ultimately stated, "[f]or all of the reasons stated herein and the court having the benefit of observing the manner of [Andre J.'s] testimony, the court finds that [Andre J.'s] claim of being interviewed by State's Attorney investigators in 2004 not to be credible."

¶ 47 As for the claims presently at issue, the court first found that defendant failed to show that trial counsel performed deficiently in failing to locate Andre J. and that defendant was not prejudiced by Andre J.'s absence. Specifically, the court first found that Laws' performance was not deficient because he knew about Andre J. and made efforts to find him. As for prejudice, the court found that Andre J.'s testimony that only five of the codefendants were present when he was shot and that defendant was not among them would not have been likely to change the result of defendant's second trial. The court noted that Andre J. was not an eyewitness to the shooting, his

shooting occurred four hours before the shooting of Williams and Kaufman, and his testimony would not have sufficiently undermined the other evidence of guilt, including the second trial testimonies of Michael J., Nicholson, and Gordon, and the first trial testimony of Deanda W., which was admitted in the second trial as impeachment.

¶ 48   Regarding defendant's claim that counsel rendered ineffective assistance by not questioning White about how many of the codefendants she saw before and after the murders, the court again found that defendant had not shown deficient performance or prejudice. The court observed that White had been called by Bannister as a witness at the second trial for the sole purpose of impeaching Nicholson by testifying that Nicholson could not have spoken to her from the window of her apartment because she was never there that night. The court found that Laws made a strategic decision to adopt Bannister's questioning without further inquiry and that such a strategic decision is generally immune from postconviction scrutiny. The court further found that, in light of the other evidence of guilt, defendant was not prejudiced by Laws' failure to question White about how many of the codefendants she had seen.

¶ 49   Defendant filed a motion for reconsideration, which the court denied following a hearing. This appeal follows.

¶ 50   The Act provides a three-stage review process for a defendant's postconviction claim of a constitutional violation, only the third of which is at issue in the present appeal. At a third-stage evidentiary hearing, the defendant must show by a preponderance of the evidence that there was a substantial violation of a constitutional right during his trial proceedings. *People v. Christopher Coleman*, 2013 IL 113307, ¶ 92 (citing *People v. Stovall*, 47 Ill. 2d 42, 47 (1970)). "At the third stage, unlike the first and second stages, the allegations are not taken as true; instead, 'the trial

court acts as a factfinder, making credibility determinations and weighing the evidence.'" *People v. House*, 2023 IL App (4th) 220891, ¶ 78 (quoting *People v. Reed*, 2020 IL 124940, ¶ 51)).

¶ 51     The parties disagree as to the standard of review that applies to the third-stage dismissal of an ineffective assistance claim. Defendant contends that we should apply a mixed standard of review, deferring to the circuit court's factual findings, but reviewing its ultimate ineffectiveness determination *de novo*. The State, on the other hand, argues that we review the circuit court's ruling for manifest error. We agree with the State.

¶ 52     In support of a mixed standard of review, defendant relies on *People v. Cassian Coleman*, 2015 IL App (4th) 131045, ¶ 66, and *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 137. In *Cassian Coleman*, the defendant argued for a manifest error standard, citing our supreme court's holding in *Christopher Coleman*, 2013 IL 113307, ¶ 98, that "we review the trial court's decision to deny relief following an evidentiary hearing for manifest error." This court rejected the defendant's reliance on *Christopher Coleman* on the grounds that *Christopher Coleman* concerned a claim of actual innocence and not a claim of ineffective assistance of counsel. *Cassian Coleman*, 2015 IL App (4th) 131045, ¶ 63. Instead, this court applied a mixed standard of review, relying on *Strickland v. Washington*'s statements that "'[i]neffectiveness [was] not a question of basic, primary, or historical fact' but, rather, 'both the performance and prejudice components of the ineffectiveness inquiry [were] mixed questions of law and fact.'" (Alterations in original.) *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 698 (1984)). In doing so, this court noted that "the appellate court repeatedly has held that claims of ineffective assistance call for a hybrid standard of review" and cited several cases applying such a standard. *Cassian Coleman*, 2015 IL App (4th) 131045, ¶ 66. Defendant's second case, *Velasco*, applied the same mixed standard in

reliance on *People v. Phillips*, 2017 IL App (4th) 160557, ¶ 55, which, in turn, relied on *Cassian Coleman*.

¶ 53    However, we find *Cassian Coleman*'s analysis misguided. As a starting point, our supreme court has consistently maintained that, "[w]hen a petition is advanced to a third-stage, evidentiary hearing, where fact-finding and credibility determinations are involved, we will not reverse a circuit court's decision unless it is manifestly erroneous." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006) (citing *People v. Childress*, 191 Ill. 2d 168, 174 (2000)); see also *People v. Reed*, 2020 IL 124940, ¶ 51; *People v. English*, 2013 IL 112890, ¶ 23; *Christopher Coleman*, 2013 IL 113307, ¶ 98; *People v. Beaman*, 229 Ill. 2d 56, 72 (2008); *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). We only apply a *de novo* standard of review "[i]f no such determinations are necessary at third stage, *i.e.,* no new evidence is presented and the issues presented are pure questions of law." *Pendleton*, 223 Ill. 2d at 473; see also *People v. McCoy*, 2026 IL 131565, ¶ 51; *People v. Harris*, 2025 IL 130351, ¶ 44; *People v. Newlin*, 2026 IL App (5th) 220764-U, ¶ 85; *People v. Jones*, 2025 IL App (1st) 240709-U, ¶ 41. This dichotomy affording deference to the lower court when it has held an evidentiary hearing is based on "the understanding that the post-conviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a 'position of advantage in a search for the truth' which 'is infinitely superior to that of a tribunal where the sole guide is the printed record.'" *People v. Dedrick Coleman*, 183 Ill. 2d 366, 384 (1998) (quoting *Johnson v. Fulkerson*, 12 Ill. 2d 69, 75 (1957)).

¶ 54    *Cassian Coleman* is inconsistent with the supreme court's clear and repeated statements on this issue, including its holdings in *English*, *Christopher Coleman*, and *McCoy*, and we therefore decline to follow it. Here, the circuit court held a third-stage evidentiary hearing, assessed the

credibility of witnesses, and made factual findings. Thus, we will reverse the court's decision only if it is manifestly erroneous, which is defined as "'clearly evident, plain, and indisputable'" such that the opposite conclusion is clearly evident. *Christopher Coleman*, 2013 IL 113307, ¶ 98 (quoting *Morgan*, 212 Ill. 2d at 155).

¶ 55 Defendant raises two claims of ineffective assistance of trial counsel. "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 687). "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694).

¶ 56 For the following reasons, we hold that, regardless of whether defendant established deficient performance on either of his ineffective assistance claims, he failed to demonstrate that he was prejudiced by counsel's alleged errors. Accordingly, we need not discuss the deficiency prong and will instead proceed to the prejudice analysis. See *People v. Givens*, 237 Ill. 2d 311, 331 (2010) ("If it is easier to dispose of an ineffective assistance claim on the ground that it lacks sufficient prejudice, then a court may proceed directly to the second prong and need not determine whether counsel's performance was deficient." (citing *Strickland,* 466 U.S. at 697)).

¶ 57 "With respect to *Strickland*'s prejudice prong, '[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" *People v. Johnson*, 2021 IL 126291, ¶ 54 (quoting *Strickland*, 466

U.S. at 691). In assessing prejudice, "'the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 111 (2011)). "'Instead, Strickland asks whether it is "reasonably likely" the result would have been different.'" *Id.* (quoting *Harrington*, 562 U.S. at 111). "A reasonable probability that, but for counsel's errors, the result of the proceeding would have been different is a 'probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). "[T]he question is whether there is a reasonable probability that, absent counsel's errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* (citing *Strickland*, 466 U.S. at 695).

¶ 58    Under *Strickland*, a defendant must "affirmatively prove" that prejudice resulted from counsel's errors and it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Johnson*, 2021 IL 126291, ¶ 55 (quoting *Strickland*, 466 U.S. at 693). "Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced." *People v. Patterson*, 2014 IL 115102, ¶ 81.

¶ 59    In his first claim, defendant asserted that trial counsel rendered ineffective assistance by failing to locate and call Andre J. as a witness at his second trial because Andre J. could have testified that defendant was not present when Andre J. was shot, thereby contradicting Michael J.'s account of the evening and undermining Michael J.'s credibility. In his second claim, defendant asserted that counsel rendered ineffective assistance by failing to cross-examine White about what she had seen before and after the shooting of Williams and Kaufman. Defendant contended that, based on White's testimony at the first trial, counsel should have been able to elicit that the group of codefendants that White saw before and after the shooting contained only five

people and that he was not among them. He argued that this would implicitly demonstrate that he did not participate in the murders.

¶ 60    Defendant further argued that, even if counsel's deficient performance on either of those claims alone did not establish prejudice, the cumulative effect of the errors did. See *People v. Garza*, 180 Ill. App. 3d 263, 270 (1989) ("Although any one error, by itself, may not amount to ineffective assistance of counsel, cumulatively, counsel's failures render the result of the proceedings 'unreliable under the standard enunciated in *Strickland*.'" (quoting *People v. Solomon*, 158 Ill. App. 3d 432, 437 (1987)).

¶ 61    We previously considered virtually identical claims in Bannister's appeal from the same third-stage proceeding, in which Bannister likewise asserted that his counsel was ineffective for failing to locate Andre J. and failing to question White about how many of the codefendants she had seen before and after the shooting. See *Bannister*, 2025 IL App (1st) 231399-U, ¶ 77. We held that, whether considered individually or cumulatively, there was no reasonable probability that the addition of Andre J.'s and White's testimony would have changed the outcome of the proceeding. See *id.* ¶¶ 77-78. The same reasoning applies in defendant's case as well.

¶ 62    The evidence implicating defendant in the murders of Williams and Kaufman was considerable. Two witnesses, Michael J. and Gordon, testified at defendant's second trial that they saw defendant actively shooting at Williams. While Carothers testified that Gordon recanted his inculpatory account in a court-reported statement, Gordon claimed that he did so under duress, and the consistency of his and Michael J.'s accounts of the shooting lends credence to that story.

¶ 63    Michael J. testified that he and Meyers went to the back hallway on the 3517 side of the building, while defendant, Kevin Y., and Carter were by the mailbox in the breezeway and James

Y. and Bannister were on the 3519 side of the building. Gordon similarly testified that Michael J. and Meyers walked past the elevators before "one went up back and one went up the front stairway," defendant, Kevin Y., and Carter were in front of the breezeway, and two unknown men went behind a breezeway pillar on the 3519 side of the building. The fact that Michael J. and Gordon both claimed that there were seven shooters in three groups of two, three, and two people, both placed those three groups in essentially the same locations, both reported identical compositions of those groups, both testified that the shooting started with someone saying "come here motherf***r," and both claimed to have seen defendant carrying the same type of weapon lends significant credibility to their stories. Michael J.'s account at trial was also substantially consistent with his statement to police in 1989.

¶ 64    Further, although he recanted it, Deanda W.'s first trial testimony, which was admitted at defendant's second trial as impeachment, was also largely consistent with Michael J.'s and Gordon's accounts in that Deanda W. claimed to have seen seven shooters in groups of two, three, and two people in the same three locations. Deanda W.'s placement of four of the seven codefendants within those groups was also consistent with Michael J.'s and Gordon's accounts.

¶ 65    Another factor implicating defendant was Dan Nicholson's testimony that defendant was present with the other six codefendants when Nicholson was robbed shortly before the shooting of Williams and Kaufman. Nicholson also testified that right before the shooting started, he heard someone say, "catch that motherf***r," a similar statement to what Michael J. and Gordon claimed to have heard, lending further credibility to all three stories.

¶ 66    The potential testimony of White and Andre J. would not have materially undermined this inculpatory evidence. White may have seen only five of the codefendants in Tolbert's apartment

before and after the shooting, but who she saw in the apartment, away from the scene of the crime, does not necessarily rebut Michael J.'s and Gordon's testimony that there were seven shooters and that defendant was among them. White did not witness the shooting. We also observe that the jury at the first trial was presented with similar competing facts, with Deanda W. claiming to have seen defendant participate in the shooting of Williams and Kaufman and White claiming not to have seen defendant in Tolbert's apartment before or after the shooting, yet the jury found Deanda W.'s eyewitness account of the shooting more persuasive. We likewise find that White's testimony does not sufficiently counter Michael J.'s and Gordon's eyewitness accounts, which were even stronger evidence of guilt given their consistency.

¶ 67    Andre J.'s testimony that only five of the codefendants were present when he was shot and defendant was not one of them is of similar minor value because Andre J. testified that his shooting took place several hours before the shooting of Williams and Kaufman, and he was not present for the shooting at issue in this case. While his testimony may have impeached Michael J.'s account of the shooting and thereby hurt Michael J.'s credibility to some degree, that impeachment would have been overshadowed by the significant corroboration of Michael J.'s story by Gordon, Nicholson, and Deanda W. As we concluded in Bannister's appeal, "[t]his evidence may have been helpful to the defendant's case, but in order to succeed on a claim of ineffective assistance of counsel the defendant was required to show that there is a reasonable probability that the outcome of the trial would have been different, and none of this evidence, even if considered together, would have had that effect." *Bannister*, 2025 IL App (1st) 231399-U, ¶ 78.

¶ 68    Because defendant failed to demonstrate that he was prejudiced by counsel's deficient performance in either of his two ineffective assistance of counsel claims, the circuit court's dismissal of defendant's petition was not manifestly erroneous, and we affirm its ruling.

¶ 69    As a final matter, we note that defendant twice filed motions in this appeal seeking to discharge his appointed appellate counsel and to file a *pro se* brief arguing that the circuit court erred in dismissing two of his claims at the second stage of postconviction proceedings. The first motion was filed after his counsel filed his initial brief, and the second came after all briefing was completed. We denied both motions on the grounds that a defendant does not have a constitutional right to self-representation on appeal and his request otherwise came too late. See *People v. Jackson*, 362 Ill. App. 3d 1196, 1200 (2006) (declining to allow a defendant to represent himself and file a *pro se* brief after briefing was complete). However, we note here that the issues that defendant sought to raise in a potential *pro se* brief, namely that the State violated his right to due process by knowingly presenting perjured testimony from Michael J. at the second trial and that counsel rendered ineffective assistance by not seeking to have Deanda W.'s testimony barred from the second trial on collateral estoppel grounds, were addressed and rejected in Bannister's related appeal. See *Bannister*, 2025 IL App (1st) 231399-U, ¶¶ 74-76, 80-81. After reviewing defendant's arguments, we find the result would be the same in the present case and reject them.

¶ 70    For the foregoing reasons, we affirm the circuit court's judgment dismissing defendant's petition for postconviction relief.

¶ 71    Affirmed.

No. 1-23-2404

---

*People of the State of Illinois v. Eric Smith* **2026 IL App (1st) 232404**

---

Appeal from the Circuit Court of Cook County, No. 90 CR 16798, Honorable Patrick Coughlin, Judge, presiding.

---

Appellant Attorneys:  JAMES E. CHADD State Appellate Defender
DOUGLAS R. HOFF Deputy Defender
CARRIE DARDEN Assistant Appellate Defender
Office of the State Appellate Defender First Judicial District
203 N. LaSalle St., 24th Floor Chicago, IL 60601
Phone:  (312) 814-5472

Appellee Attorneys:  EILEEN O'NEILL BURKE, State's Attorney of Cook County
JOHN E. NOWAK BRIAN K. HODES LESLIE BILLINGS, Assistant State's Attorneys
Cook County State's Attorney's Office Criminal Appeals Division
Richard J. Daley Center 50 West Washington Street – 3rd Floor
Chicago, Illinois 60602
Phone:  (312) 603-5464