2026 IL App (1st) 242414-U

No. 1-24-2414

Order filed May 28, 2026

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County |
| v. | ) | |
| | ) | No. 16 CR 07877 |
| VONDELL BUSH, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Charles P. Burns, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE NAVARRO delivered the judgment of the court.
Justices Lyle and Quish concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court properly denied defendant's postconviction petition, following a third-stage evidentiary hearing, where defendant did not show by a preponderance of the evidence that he received ineffective assistance of trial counsel; defendant did not receive unreasonable assistance of postconviction counsel; and trial court did not abuse its discretion in not allowing postconviction counsel to file a supplemental petition.

¶ 2    Defendant, Vondell Bush, appeals the circuit court's denial of his postconviction petition

following a third-stage evidentiary hearing. On appeal, Bush contends that: (1) he showed by a

preponderance of the evidence that he received ineffective assistance of trial counsel; (2) that he received unreasonable assistance of postconviction counsel; and (3) that the trial court abused its discretion in failing to allow defense counsel to file a supplemental petition to Bush's *pro se* postconviction petition. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The following facts are taken from this court's order in defendant's direct appeal, *People v. Bush*, 2019 IL App (1st) 170749-U, and from our order in his appeal from the circuit court's denial of his first-stage postconviction petition, *People v. Bush*, 2022 IL App (1st) 210509.

¶ 5      Bush was charged with six counts of attempted murder and one count of aggravated battery stemming from the shooting of Wayne Battles. At Bush's bench trial, Battles testified that on the morning of February 16, 2016, he was working as a janitor in the trash compactor room at the Lake Meadows apartment building in Chicago. He was 62 years old at the time. At approximately 6 a.m. Bush entered the room. In a hostile voice, Bush told Battles he was "in [Bush's] business." Battles replied that he did not know what Bush was talking about. He had seen Bush in the building before but knew he was not a resident.

¶ 6      After a brief exchange, Bush turned and walked toward the door. Battles followed, as he had finished his task. Bush suddenly turned around and hit Battles in the jaw with his right fist. Battles grabbed a nearby hammer as he chased Bush outside the building. Battles testified that he never attempted to hit Battles with the hammer, nor was he ever close enough to hit him.

¶ 7      Once outside, Bush slipped and fell on the concrete. He rolled, rose to his knee with a pistol in his hand, and shot Battles in the left leg. Battles said, "man, you shot me?" and Bush responded, "you came at me with a hammer." Battles retreated and called the police. He was treated at the hospital for a gunshot wound to his calf and later identified Bush in a photo array.

¶ 8    On cross-examination, Battles testified that he and Bush were four or five feet apart when Bush fell. Battles stopped moving and was not standing over Bush when he shot the gun. He did not raise the hammer against Bush at any time. Battles did not say anything to Bush as he chased him. During the chase, he did not see a gun on Bush.

¶ 9    Detective Angelo Velazquez testified that after obtaining a warrant for Bush's arrest, he learned that Bush was in custody in Las Vegas, Nevada. Bush was extradited to Chicago.

¶ 10    Bush testified that on February 16, 2016, he had spent the night at the Lake Meadows apartment building with his friend. Bush wanted to talk to Battles because Battles had questioned his friend about "inappropriate" topics and Bush wanted to ask him to stop speaking with her. After inquiring about the "nosy janitor," Bush was directed toward the trash compactor room. There, he asked Battles why he was so nosy. Battles became aggressive, poking his finger at Bush. When Bush turned to walk away, Battles called him a "little b****." Bush responded, "f*** you." Battles attempted to grab Bush's hair, but Bush pushed him away. Battles then picked up a hammer and charged at Bush with the hammer "raised up." Bush ran out the door because he was afraid Battles would hit him with the hammer.

¶ 11    As Bush ran down the hall, Battles was "right behind" him. As soon as Bush crossed the door to get outside, he fell forward. He got up and tried to escape from Battles who was right behind him with the hammer raised. A few steps later, Bush tripped and fell again. The second time he fell, he thought Battles was going to hit him in the head with the hammer while he was on the ground. Bush tried to get up but could not because Battles was "right on top" of him, running toward him with the hammer raised.

¶ 12    Bush testified that the second time he fell, his bookbag opened and his lunch bag fell out. His lunch bag contained his revolver. He took the gun and shot at Battles, who was three to five

feet away. Battles was holding the hammer in a "striking position" at shoulder height or a little higher, and Bush thought he was going to hit him with it.

¶ 13    After Bush shot him, Battles dropped the hammer and ran into the building. Bush did not know his shot hit Battles. Bush testified that although he had a gun with him that morning, he did not intend to use it against Battles.

¶ 14    Bush moved to Las Vegas two days later with his girlfriend, Heyreen Littlejohn, as they had planned to do before the shooting. Bush testified that at the time they left, there was no warrant for his arrest.

¶ 15    In closing argument, defense counsel argued that Bush shot Battles in self-defense. He disputed Battles' version of the confrontation in the compactor room and emphasized that Bush never took out his gun while he was in the building. Battles, however, chased Bush with a hammer and did not stop running toward him even as Bush fell. Counsel argued that Bush believed Battles intended to inflict great bodily harm upon him. Counsel stated that, "[t]he afterwards behavior of leaving doesn't change that." The following exchange then occurred between the trial judge and defense counsel:

"Q: Doesn't it show evidence of guilty knowledge?

A: No, your Honor.

Q: Flight from the –

A: What it shows –

Q: Flight to Las Vegas.

A: No. What it shows is a bad choice on something, but it doesn't show any evidence of guilt."

¶ 16     The trial court acknowledged that "[i]n order for me to make findings on this, I have to make credibility determinations." Addressing whether Bush was justified in using force as he did, the trial court had "no doubt" that Bush was the initial aggressor. It found his testimony that Battles was the aggressor "totally incredible" and did not believe Battles pushed Bush.

¶ 17     Although Battles picked up a hammer and chased Bush out of the building, the court found that Battles had "every right to chase Bush out of the building." It also found that the fact that Battles was holding a hammer "doesn't necessarily mean that the defendant had a right to turn around and use the gun."

¶ 18     The court stated that Bush, as the initial aggressor, was entitled to use force "in limited circumstances." He could respond forcefully if the force used against him "is so great that he reasonably believes that he is in imminent danger of death or great bodily harm and he exhausted every reasonable means to escape such danger." An aggressor may also use force if "in good faith he withdraws from physical contact" and clearly indicates his intent to withdraw, but the assailant continues to use force. The court found that neither of these statutory exceptions applied.

¶ 19     Instead, the court viewed Bush's testimony as "very, very incredible" and "insulting to the Court." The court also found it "convenient" that Bush was scheduled to move to Las Vegas "right after the shooting." It believed that Bush "had guilty knowledge here, and the reason he fled was because he knew he did something wrong." The court concluded that Bush was not "in any way, shape, or form ever intimidated by the victim." Therefore, it did not believe "he has a subjective or an objective legal defense of self-defense in this matter. I believe any force that was used was excessive." The trial court found Bush guilty of aggravated battery and not guilty of attempted murder.

¶ 20    Bush filed a motion for a new trial. At the hearing, the court disagreed with defense counsel that Bush acted in self-defense when he shot Battles. It pointed out that Bush "was looking for the victim and confronted the victim." After he found Battles, "it was a hostile situation, and there's confrontation and there's a punch thrown." The court again noted that Bush moved to Las Vegas shortly after the shooting which also "goes to his mental state at the point in time." The court believed that Bush did not think the shooting was justified or he would have "stay[ed] on the scene." As the court explained, "[h]e leaves the state, which I found to be totally incredible as to the purpose that he said, that he was just going to be leaving the state anyway." Bush's flight from the state indicated "[t]hat he didn't have a reasonable belief in self-defense."

¶ 21    Considering the totality of the circumstances, the court denied Bush's motion for a new trial and sentenced him to 15 years' imprisonment.

¶ 22                          Direct Appeal

¶ 23    On direct appeal, Bush argued that his aggravated battery conviction should be reversed because the State failed to prove beyond a reasonable doubt that he was not acting in self-defense when he shot Battles. Noting that the issue turned on the trial court's credibility determinations, this court affirmed Bush's conviction. We found no merit to Bush's self-defense argument where "the evidence supports a finding that Battles did not use force against defendant, and defendant did not reasonably believe he was in imminent danger of death or great bodily harm when he shot Battles." *Bush*, 2019 IL App (1st) 170749-U, ¶ 23.

¶ 24                    Postconviction Proceedings

¶ 25    Bush then filed a *pro se* postconviction petition. He argued in part that his trial counsel was ineffective for failing to call Littlejohn and Rena Livingston as witnesses. Attached to his petition was Littlejohn's affidavit. Therein, she stated that she received a job offer as a phlebotomist in Las

Vegas around the first week of February 2016. She and Bush planned to make a trip to Las Vegas on February 18, 2016, so that she could accept the position and find an apartment. They chose that date because they were first going to help her daughter move into an apartment at Lake Meadows on February 15. Littlejohn stated that she and Bush arrived in Las Vegas on February 20, 2016, and she had been living there ever since.

¶ 26    Littlejohn further stated that on February 16, 2016, before they left for Las Vegas, she and Bush drove to the Cook County courthouse and went to the cafeteria, where they met with attorney Daniel Franks. After they spoke, Bush obtained a signed receipt of $500. The receipt was on the back of Franks' business card and showed that Bush paid Franks a retainer fee. Attached to Bush's petition was a copy of a card on which was written, "Received $500.00 2/16/16," with an illegible signature.

¶ 27    Also attached to the petition was Bush's affidavit. He stated that he "attempted to contact Rena Livingston in regards to obtaining an affidavit attesting to the information she told me about" Battles. Livingston told Bush that Battles "was on the football team and has always been a very large man over 6 feet and weighing over 200(+) pounds. He went by the nickname 'Tank' and has always been known to be an overly aggressive and irritable person." Livingston was Bush's mother's best friend. She told Bush's mother that "she did not want to be involved with any legal proceeding."

¶ 28    In its written order, the trial court considered Littlejohn's statements that she and Bush planned to move to Las Vegas in February, thereby implying that Bush did not flee to avoid prosecution. The court found, however, that:

"right after the incident Bush obtained counsel, Daniel Franks. The counsel advised

Bush to turn himself in. Bush failed to do so. Rather, he fled the state. Moreover,

this court did not consider the fleeing before coming to judgment. Furthermore, the affidavit of Bush's fiancé does not claim of self-defense, only at best evidence that he might not have fled the jurisdiction."

¶ 29    The court found Bush's affidavit that set forth Livingston's statements about Battles "unacceptable," noting that she did not present her own affidavit. Also, the statements therein were "conclusory" and "unspecific regarding time and detail." The court reiterated that Battles testified at trial and thus it had the opportunity "to look at the discrepancy between the age, height, weight of the defendant and the alleged victim in this matter." The court dismissed Bush's petition as frivolous and patently without merit. Bush appealed.

¶ 30                    Appeal From Dismissal of Postconviction Petition

¶ 31    On appeal, this court found that it was certainly arguable that the failure to call Littlejohn as a witness was deficient performance and prejudiced Bush in his claim of self-defense. We noted that the trial court ultimately found Battles to be more credible and did not believe Bush's testimony that he and Littlejohn had planned to move to Las Vegas for her job. Instead, the court concluded that Bush's flight to Las Vegas showed "he didn't have a reasonable belief in self-defense." We found that if Littlejohn had testified, the trial court would have observed her demeanor and could have found her to be a credible witness. Her credible testimony arguably could have made Bush more believable as a witness and could have altered the court's finding that Bush fled after the shooting. *Bush*, 2022 IL App (1st) 210509, ¶38.

¶ 32    We found that Bush's petition met the low threshold requirement to allege his ineffective assistance of counsel claim as to Littlejohn and reversed the trial court's dismissal of the postconviction petition at the first stage. The case was remanded for second-stage proceedings.

¶ 33              Second and Third Stage Postconviction Proceedings Upon Remand

¶ 34    Upon remand, Bush was assigned an attorney. At a May 2023 status conference, Bush's counsel stated that she had a "supplemental" to file. The court responded:

> "I don't allow supplementals. I allow an amended petition. I don't allow supplemental.
>
> So you are going to have to talk with [Bush] and see whether you are going to advance any of his claims."

¶ 35    On June 20, 2023, counsel filed her Rule 651(c) certificate which stated in part, "I have examined Petitioner's *pro se* Petition for Post-Conviction Relief. I believe it adequately represents Petitioner's claims." Counsel did not amend Bush's *pro se* petition.

¶ 36    The case then proceeded to a third-stage evidentiary hearing. At the hearing, Littlejohn testified that Bush had been her fiancé, and that she had been in a relationship with him for 13 or 14 years. In February 2016, she was living at an apartment complex called Lake Meadows, in Chicago, with Bush and her daughter. She and Bush had plans to move to Las Vegas because Littlejohn had applied for a phlebotomy position there, and had an interview lined up.

¶ 37    Littlejohn knew there had been an incident a few days prior to the move, but she did not know exactly what happened. She testified that she was not asked or subpoenaed to testify in Bush's trial but would have been willing to do so.

¶ 38    Bush's trial attorney, Mark Kusatzky, testified that he had practiced criminal defense law in Chicago since 1987, and had conducted hundreds of trials. He testified that he had talked to Littlejohn before Bush's trial but ultimately decided not to call her as a witness because he "would have wanted documentation that [the trip] existed before [] the incident took place therefore it's verifiable, therefore it was preplanned."

¶ 39    In response to questions from the court, Kusatzky stated that he had spoken to Franks, the attorney Bush briefly met with before moving to Las Vegas, but decided not to call him as a witness. Kusatzky stated that it was his professional opinion that calling Franks to testify would not have helped Bush's case. Finally, Kusatzky testified that he did not recall Bush ever mentioning Livingston, and that the trial judge had ample opportunity to note Battles' size.

¶ 40    Bush testified that he had been planning to move to Las Vegas before confronting Battles. He had travelled there in January of 2016 to "scout for some apartments and housing." He and Littlejohn moved their furniture into Littlejohn's daughter's apartment in preparation for the move. Bush testified that Kusatzky never contacted Littlejohn to ask for documentation to prove that the move to Las Vegas was preplanned.

¶ 41    Bush testified that when he met with Franks after the shooting, Franks told him he would have to turn himself in if police obtained an arrest warrant, but that it sounded like he had a self-defense case. Bush gave Franks $500 towards a $1,000 retainer. Bush testified that after this conversation, he thought he did not have to turn himself in. He also testified that he told Kusatzky about this conversation with Franks.

¶ 42    When counsel asked Bush about Battles' reputation in the neighborhood, the court asked, "did you amend the petition to include ineffective assistance because [trial counsel] did not investigate *Lynch* material on the victim?" Counsel for Bush replied, "I didn't amend the petition but in the original petition Mr. Bush alleges that it is ineffective for failing to investigate *Lynch* material." The court responded, "This is – this really should have been pled, I'll let you go into this but this should have been pled, Counsel. You have a right to amend the *pro se* pleadings. Go ahead."

¶ 43    During closing arguments, Bush's counsel argued that the trial court had stated that Bush's move to Las Vegas was an indication of a guilty conscience, and that if trial counsel had presented Littlejohn's testimony that the move was planned prior to the incident, it was possible the court would have found Bush more credible. The State argued that trial counsel had used his professional discretion in trying the case, and that Bush had not made a substantial showing of a constitutional violation.

¶ 44    The court, in a written ruling, denied Bush's postconviction petition. The court rejected the claim that trial counsel was ineffective for failing to call Littlejohn as a witness, failing to call Franks as a witness, and failing to put Battles' size into evidence. The court found that Kusatzky credibly testified that he wanted documentary support before presenting Littlejohn as a witness, especially since there was not a clear timeline. The court concluded that Bush "fails to show a substantial constitutional violation by a preponderance of the evidence," and therefore "fails to meet his evidentiary burden at the third-stage postconviction proceeding."

¶ 45    Bush now appeals.

¶ 46                                    II. ANALYSIS

¶ 47    On appeal, Bush contends that he showed by a preponderance of the evidence that there was a substantial violation of his constitutional right to effective assistance of trial counsel.

¶ 48    The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2024)) provides a means by which a defendant may challenge his conviction or sentence for violations of federal or state constitutional rights. *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005). To be entitled to postconviction relief, a defendant must show that he has suffered a substantial deprivation of his federal or state constitutional rights in the proceedings that produced the conviction or sentence being challenged. *Id.*

¶ 49    At the first stage, the circuit court has 90 days to review a petition and may summarily dismiss it if the court finds it is frivolous and patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2024). If the petition is not dismissed, it must be docketed for further consideration.

¶ 50    At the second stage of postconviction proceedings, counsel may be appointed for defendant, as was the case here. 725 ILCS 5/122-4 (West 2024). Counsel's duties at the second stage, pursuant to Rule 651(c), include consultation with the defendant to ascertain his contentions of deprivation of constitutional rights, examination of the record of the proceedings at trial, and amendment of the petition, if necessary, to ensure that defendant's contentions are adequately presented. Ill. S. Ct. R. 651(c) (eff. Jul. 1, 2017). "At this stage, the circuit court must determine whether the petition and any accompanying documentation make a 'substantial showing of a constitutional violation.'" *People v. Domagala*, 2013 IL 113688, ¶ 33 (quoting *People v. Edwards*, 197 Ill. 2d 239, 246 (2001)).

¶ 51    If the petitioner makes the requisite substantial showing that his constitutional rights were violated, he is entitled to a third-stage evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 34. At such a hearing, the petitioner must show by a preponderance of the evidence that there was a substantial violation of a constitutional right during his trial proceedings. *People v. Coleman*, 2013 IL 113307, ¶ 92. At the third stage, the circuit court serves as the factfinder, and, therefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts. *Id.*

¶ 52    When a petition is advanced to a third-stage evidentiary hearing, where fact-finding and credibility determinations are involved, we will not reverse a circuit court's decision unless it is manifestly erroneous. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). Manifest error is "clearly evident, plain, and indisputable." *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). "Thus, a decision

is manifestly erroneous when the opposite conclusion is clearly evident." *People v. Christopher Coleman*, 2013 IL 113307, ¶ 98. We reject Bush's argument that we should use a mixed standard of review – deferring to the circuit court's factual findings but reviewing its ultimate ineffectiveness determination *de novo* – for the same reasons stated in our recent opinion of *People v. Smith*, 2026 IL App (1st) 232404, ¶¶ 52-54.

¶ 53                      A. Ineffective Assistance of Trial Counsel

¶ 54    In examining ineffective-assistance-of-trial-counsel claims, this court follows the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Johnson*, 2021 IL 126291, ¶ 52. A defendant must show that counsel's performance (1) fell below an objective standard of reasonableness and (2) resulted in prejudice. *Id*. To establish prejudice, a defendant must demonstrate a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Id*.

¶ 55    Decisions regarding which evidence to present and which witnesses to call are matters of trial strategy (*People v. Hamilton*, 361 Ill. App. 3d 836, 847 (2005)), and counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary (*People v. Pecoraro*, 175 Ill. 2d 294, 324-25 (1997)). Strategic choices made by counsel after having made a thorough investigation are "virtually unchallengeable." *People v. Towns*, 182 Ill. 2d 491, 514 (1998).

¶ 56    Here, Bush argues that his trial counsel was ineffective where he failed to call three witnesses – Littlejohn, Franks, and Livingston – because if the trial court had heard their testimony, it would have "afforded Bush's version of events more credibility and acquitted him."

¶ 57    Regarding Littlejohn, Bush claims that she would have corroborated his testimony that they planned to move to Las Vegas before the shooting took place and therefore did not "flee the

jurisdiction" by going there shortly after the shooting. At the hearing, Kusatzky, Bush's trial counsel, testified that he was aware of Littlejohn and had spoken to her prior to trial. He testified that he had not heard about a specific job or timeline and did not receive any verification of a job. Kusatzky testified that he did not believe the move could be proven as a preplanned event. The trial court found Kusatzky's testimony to be credible.

¶ 58    Littlejohn and Bush both testified at the hearing that they planned to move to Las Vegas in January 2016. Bush also testified that they planned to move there six weeks before the February 16, 2016, incident. Later in the hearing, Bush stated that he went to Las Vegas in the last week of January to look at apartments. In his postconviction petition, Bush claimed that he and Littlejohn had planned to make the trip on February 17, 2016. The court noted that Littlejohn and Bush provided "contradictory and unsupported" information regarding their move to Las Vegas.

¶ 59    Here, we cannot say that the court's credibility determinations were manifestly erroneous where the determinations support the court's finding that counsel's investigation of Littlejohn was adequate and his decision not to call her was a matter of trial strategy. *People v. Smith*, 195 Ill. 2d 179, 188 (2000) (matters of trial strategy are generally immune from claims of ineffective assistance of counsel). Also, there can be no finding of ineffective assistance of counsel unless Bush showed that he was prejudiced by his counsel's alleged failure to investigate and call the witnesses such that there is a reasonable probability that the result of the trial would have been different had the witnesses testified. *Strickland*, 466 U.S. at 694. The postconviction court expressly found that Littlejohn's and Bush's testimony regarding their move to Las Vegas was contradictory, and therefore there was no reasonable probability that the outcome of Bush's trial would have been different if trial counsel had presented Littlejohn as a witness.

¶ 60 Regarding Franks, Bush contends that Franks would also have corroborated his testimony that he did not flee to Las Vegas by testifying that Bush met with him after the shooting and was told he did not need to turn himself in. Bush's trial counsel testified at the evidentiary hearing that he spoke to Franks and decided not to call him as a witness because it "would not have aided that issue." The court found trial counsel's testimony to be credible and that counsel made an "intentional and reasonable choice" not to call Franks at trial. We cannot say that this credibility determination was manifestly erroneous where trial counsel could have reasonably believed that introducing evidence that Bush met with an attorney following the shooting would not aid in Bush's self-defense claim.

¶ 61 And finally, Bush contends that Livingston would have testified that Battles had a reputation for behaving aggressively. However, as the court noted, Bush failed to present an affidavit or testimony from Livingston that supported the claim that she would attest to Battles' reputation. See *People v. Enis*, 194 Ill. 2d 361, 380 (2000) ("A claim that trial counsel failed to investigate and call a witness must be supported by an affidavit from the proposed witness."). In the absence of an affidavit or testimony, a reviewing court cannot determine whether the proposed witness could have provided testimony or information favorable to the defendant. *Id.*

¶ 62 Accordingly, the circuit court's decision to deny Bush's postconviction petition after a third-stage evidentiary hearing, based on Bush's failure to establish by a preponderance of the evidence that he received ineffective assistance of trial counsel, was not improper.

¶ 63 B. Unreasonable Assistance of Postconviction Counsel

¶ 64 There is no constitutional right to counsel during postconviction proceedings. *People v. Cotto*, 2016 IL 119006, ¶ 29. Rather, "[t]he right to assistance of counsel in postconviction proceedings is a matter of legislative grace, and a defendant is guaranteed only the level of

assistance provided by [the Act]." *People v. Hardin*, 217 Ill. 2d 289, 299 (2005). Our supreme court has held that the Act affords postconviction petitioners the right to a reasonable level of assistance of counsel, which is "less than that afforded by the federal or state constitutions." *Pendleton*, 223 Ill. 2d at 472.

¶ 65    At the second stage of postconviction proceedings, postconviction counsel's duties are prescribed by Rule 651(c). *People v. Addison*, 2023 IL 127119, ¶ 37. Rule 651(c) provides a "vehicle for ensuring a reasonable level of assistance." *Cotto*, 2016 IL 119006, ¶ 41. Rule 651(c) provides, in relevant part, that postconviction counsel must certify that he or she (1) "has consulted with petitioner by phone, mail, electronic means or in person to ascertain his or her contentions or deprivation of constitutional rights"; (2) "has examined the record of the proceedings at trial"; and (3) "has made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petition's contentions." Ill. S. Ct. R. 651(c) (eff. Jul. 1, 2017). A Rule 651(c) certificate filed by counsel presents a rebuttable presumption that counsel provided reasonable assistance. *People v. Profit*, 2012 IL App (1st) 101307, ¶ 19. The defendant has the burden to overcome this presumption by establishing that his appointed counsel did not comply with the mandatory Rule 651(c) duties. *Id.*

¶ 66    Here, postconviction counsel filed a Rule 651(c) certificate during the second stage of proceedings, creating a rebuttable presumption that she complied with the rule's requirements that she consult with defendant about his allegations that he was deprived of his constitutional rights, examine the trial record, and make any necessary amendments to the petition to adequately present defendant's claims. See *People v. Urzua*, 2023 IL 127789, ¶ 54. Accordingly, Bush bears the burden of overcoming the presumption that postconviction counsel provided reasonable assistance at the second stage of proceedings.

¶ 67    Bush attempts to rebut the presumption by arguing that postconviction counsel failed to amend the postconviction petition to shape his claim of ineffective assistance of counsel into an appropriate legal form. Specifically, he contends that postconviction counsel failed to include an explicit assertion that he was prejudiced by trial counsel's alleged deficiencies, failed to attach an affidavit from Bush confirming he provided his trial attorney with contact information for Franks and Livingston, failed to attach an affidavit from Franks corroborating details of their meeting, and failed to attach an affidavit from Livingston supporting Bush's claim that Battles attacked him first.

¶ 68    Here, the record is silent as to counsel's reasons for ultimately electing not to amend the petition, which may have been strategic. *People v. Coons*, 2024 IL App (4th) 230552, ¶ 38. Accordingly, nothing in the record rebuts the presumption that counsel complied with Rule 651(c) at the second stage. Moreover, because the circuit court advanced the petition to the third stage, it appears that Bush's claims were in an appropriate legal form. See *People v. Watson*, 2022 IL App (5th) 190427, ¶ 46 (because the circuit court advanced the petition and supplement to a third-stage hearing, it appears that the supplement was sufficient to shape defendant's claims into an appropriate legal form).

¶ 69                              C. Supplemental Petition

¶ 70    Bush's final contention on appeal is that the postconviction court abused its discretion by refusing to consider the supplemental petition to Bush's *pro se* petition that postconviction counsel attempted to file.

¶ 71    As discussed above, second-stage postconviction counsel is required to make a showing that she consulted with petitioner, examined the record of proceedings at trial, "and has made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of

- 17 -

petitioner's contentions." Ill. S. Ct. R. 651(c) (eff. Jul. 1, 2017). "[T]he Act does not contemplate the filing of a 'supplemental petition.' " *People v. Ellis*, 2025 IL App (1st) 230320-U, ¶ 35.

¶ 72 Here, at a status conference, Bush's counsel stated that she had a "supplemental" to file. The court responded:

"I don't allow supplementals. I allow an amended petition. I don't allow supplemental.

So you are going to have to talk with [Bush] and see whether you are going to advance any of his claims."

¶ 73 We do not find that the court abused its discretion in this case by not allowing counsel to file a supplement to the petition. Section 122-5 of the Act states that the court "may in its discretion make such order as to amendment of the petition or any other pleading, or as to pleading over, or filing further pleadings, or extending the time of filing any pleading other than the original petition, as shall be appropriate, just and reasonable and as is generally provided in civil cases." 725 ILCS 5/122-5 (West 2024). Additionally, "we do not look favorably" on the practice of filing supplemental petitions because they tend to "add confusion rather than facilitate the presentation and adjudication of a *pro se* petitioner's claims." *Ellis*, 2025 IL App (1st) 230320-U, ¶ 35.

¶ 74 Here, the court stated that it would allow counsel to file an amended petition, which is what is contemplated by the Act, and noted that counsel would have to talk to Bush and decide whether to advance any of his claims. A month later, counsel filed her Rule 651(c) certificate and chose not to amend the *pro se* petition, noting that she examined Bush's *pro se* petition and believed it adequately represented his claims. Apparently, the court agreed, as the petition was advanced to the third stage of postconviction proceedings. *Watson*, 2022 IL App (5th) 190427, ¶ 46.

Accordingly, we do not find that the court abused its discretion by asking counsel to file an amended petition rather than a supplement to the petition.

¶ 75    Bush's reliance on *People v. Patrick*, 233 Ill. 2d 62 (2009), does not convince us otherwise. In *Patrick*, the trial judge summarily refused to consider the admissibility of any of the defendant's prior convictions before the defendant testified. *Id*. at 74. The judge had a "blanket refusal in every criminal case to rule on any motions *in limine* seeking to bar introduction of prior convictions until after the defendants testified." *Id*. Our supreme court noted that a criminal defendant's right to testify on his own behalf, or not to testify at all, is an important tactical determination. *Id*. at 69. A defendant who chooses to testify faces serious risks of impeachment and may open the door to otherwise inadmissible evidence. *Id*. The court noted that making this important decision to testify without an opportunity to evaluate the actual strength of the State's evidence restricts the defense in planning its case. *Id*. at 69-70. "Obviously, defendants benefit from rulings on the admissibility of their prior convictions made before they decide to testify." *Id*. at 70. Our supreme court found that a trial court's failure to rule on a motion *in limine* on the admissibility of prior convictions when it has sufficient information to make a ruling constitutes an abuse of discretion. *Id*. at 73.

¶ 76    We find *Patrick* to be inapposite to the case at bar. In *Patrick*, the defendant was forced to make a decision about whether to testify or not, without knowing if he would be impeached by his prior convictions. Here, no such arbitrary policy was at play. The court stated that it would allow amendments, as specifically contemplated by the Act, but not supplements. The court did not prohibit postconviction counsel from filing an amendment on Bush's behalf at a later date, and in fact told postconviction counsel to talk to Bush and see whether she would advance any of his claims. Ultimately, as can be seen by the next filing by postconviction counsel, she decided the claims were in proper legal form and did not need to be amended. And, as discussed above, the

court presumably agreed since the petition was advanced to the third stage. Accordingly, we do not find an abuse of discretion.

¶ 77                                III. CONCLUSION

¶ 78     For the foregoing reasons, we affirm the judgment of the circuit court denying Bush's postconviction petition.

¶ 79     Affirmed.